United States Bankruptcy Court
Southern District of Texas
**ENTERED**
October 04, 2023
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **HERITAGE POWER, LLC, et al.,** [1] | ) | **Case No. 23-90032 (CML)** |
| | ) | |
| | ) | |
| **Debtors** | ) | **Jointly Administered** |
| | ) | |

**ORDER CONFIRMING THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HERITAGE POWER, LLC, *ET AL.***

On October 4, 2023, this Court conducted a hearing (the "Confirmation Hearing") to consider confirmation of the *First Amended Joint Chapter 11 Plan of Reorganization of Heritage Power, LLC, et al.*, dated September 30, 2023 [Docket No. 544] (as modified by this Order, the "Plan"),[2] which is attached hereto as **Exhibit A** and which is deemed to incorporate any modifications pursuant to this Order. Based on the evidence presented, including the *Declaration of David Freysinger in Support of (A) Confirmation of the First Amended Joint Chapter 11 Plan of Reorganization of Heritage Power, LLC, et al.; and (B) Debtors' Emergency Motion for Entry of an Order: (I) Authorizing the Debtors to (A) Enter into the Macquarie Engagement Letter, (B) Incur and Pay Related Fees, Indemnities, and expenses, and (II) Granting Related Relief*, dated October 2, 2023 [Docket No. 548] (the "Freysinger Declaration"), the *Declaration of Landon Kenworthy in Support of Confirmation of the First Amended Joint Chapter 11 Plan of*

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: Heritage Power, LLC (9775); Blossburg Power, LLC (3538); Brunot Island Power, LLC (8482); Gilbert Power, LLC (2872); Hamilton Power, LLC (6256); Heritage Power Intermediate Holdings, LLC (8767); Heritage Power Marketing, LLC (3891); Hunterstown Power, LLC (4065); Mountain Power, LLC (6709); New Castle Power, LLC (8606); Niles Power, LLC (6766); Orrtanna Power, LLC (8863); Portland Power, LLC (3465); Sayreville Power, LLC (6167); Shawnee Power, LLC (3714); Shawville Power, LLC (8264); Titus Power, LLC (6547); Tolna Power, LLC (8431); and Warren Generation, LLC (8699). The location of the Debtors' service address is: 1360 Post Oak Blvd., Suite 2000, Houston, TX 77056.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

*Reorganization of Heritage Power, LLC, et al.*, dated October 2, 2023 [Docket No. 550] (the "Kenworthy Declaration"), the *Declaration of Aaron J. Stai in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Reorganization of Heritage Power, LLC, et al.*, dated October 2, 2023 [Docket No. 549] (the "Stai Declaration"), the *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the First Amended Joint Chapter 11 Plan of Reorganization of Heritage Power, LLC, et al.* [Docket No. 551] (the "Ballot Certification"), the arguments and representations of counsel, and the Findings of Fact and Conclusions of Law entered contemporaneously with this Order (the "Findings and Conclusions"), and the entire record in the Chapter 11 Cases, this Court has determined that the Plan satisfies the applicable provisions of the Bankruptcy Code, and should therefore be confirmed. It is therefore **ORDERED**:

**A. Confirmation of the Plan and Approval of Definitive Documents**

1. The Plan is **CONFIRMED** in its entirety under section 1129 of the Bankruptcy Code, and all of the terms and conditions contained in the Plan are **APPROVED**. The Debtors are authorized to implement the Plan in accordance with its terms and conditions.

2. The Definitive Documents (which include the Plan Supplement as filed with this Court, as may be amended through and including the Effective Date) and such other certificates, documents, and instruments that may be necessary or appropriate to effectuate the transactions contemplated thereunder and in the Plan, and the terms and conditions thereof, are **APPROVED**. All of the foregoing materials comply with the terms of the Plan, and the filing and notice of such documents was good and proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and Bankruptcy Local Rules and no other or further notice is or shall be required. The Debtors and the non-Debtor parties are authorized, with the consent of the

Required Consenting Creditors to the extent required under the Restructuring Support Agreement, to modify the Definitive Documents through and including the Effective Date without further order of this Court in each case in accordance with the applicable terms contained in the Definitive Documents at issue to the extent such Definitive Document is then in effect. The Plan and the Definitive Documents have been negotiated in good faith at arm's length and shall, on and after the Effective Date, constitute legal, valid, binding, and authorized obligations of the respective parties thereto and will be enforceable in accordance with their respective terms. The Debtors and the non-Debtor parties to the Definitive Documents are authorized to execute and deliver the Definitive Documents as contemplated by the Plan. On and after the Effective Date, the terms and conditions of the executed and delivered Definitive Documents shall be effective and enforceable as provided for therein.

3. Except as may otherwise be set forth herein, all objections to confirmation of the Plan and any other responses or reservations of rights with respect thereto, in each case, that have not been withdrawn or resolved prior to entry of this Order shall be, and hereby are, expressly overruled on the merits and denied.

4. The Findings and Conclusions constitute this Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. The Findings and Conclusions, together with all additional findings of fact and conclusions of law announced by this Court at the Confirmation Hearing, including this Court's ruling with respect to the Confirmation, are hereby incorporated into this Order. To the extent that anything in this Order constitutes findings of fact or conclusions of law, they are adopted as such.

**B. Settlement of Claims and Controversies**

5. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the payments, distributions, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the rights that a holder of a Claim or Interest may have with respect to such Claim or Interest or any distribution under the Plan on account thereof. The entry of this Order shall constitute this Court's approval, as of the Effective Date, of each of the compromises and settlements embodied in the Plan, including the treatment of Claims and Interests under the Plan, and this Court's finding that all such compromises and settlements are: (i) in the best interest of the Debtors, the Estates, the Reorganized Debtors, their respective Creditors and their respective properties and stakeholders; (ii) fair, equitable and within the range of reasonableness; and (iii) satisfy the requirements of Bankruptcy Rule 9019 and section 1123(b)(3)(A).

**C. Effects of Confirmation of the Plan**

6. The provisions of the Plan and this Order are binding on the Debtors, each holder of a Claim or Interest, each non-Debtor counterparty to an Executory Contract or Unexpired Lease with any Debtor, any party in interest in the Chapter 11 Cases, and any other Person or Entity, and each of the foregoing's respective agents, heirs, successors, and assigns, regardless of whether such Person or Entity filed a proof of claim in the Chapter 11 Cases or voted to accept the Plan.

7. Upon entry of this Order, the Debtors and their respective directors, officers, agents, attorneys, and other professionals, as well as the non-Debtor parties to the Definitive Documents, are authorized and directed to effectuate any and all transactions contemplated or

required by the Plan and Definitive Documents. On and after the Effective Date, the Debtors and their directors, officers, agents, attorneys, and other professionals, as well as the non-Debtor parties to the Definitive Documents, are authorized and directed to take all necessary and appropriate steps and corporate action to implement the terms of the Plan and the Definitive Documents, regardless of whether such actions are specifically referred to in the Plan or the Definitive Documents, without the need for further shareholder, member, director, officer, or any other corporate approvals, or further order of this Court.

8. Except as otherwise provided by the Plan or this Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan are in exchange for and in complete satisfaction, discharge, extinguishment, cancellation, termination and release of all Claims against or Interests in the Debtors or property of the Estates.

9. Except as otherwise provided in the Plan, this Order, or any other Final Order of this Court, any and all injunctions or stays in effect in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect through the Effective Date.

10. Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of this Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holders' respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder has accepted the Plan.

## D. Vesting of Assets Free and Clear of Liens and Claims

11. Except as otherwise provided in the Plan, all property of each Debtor's Estate and all property acquired by such Debtor under the Plan shall vest in the applicable Reorganized Debtor, free and clear of all Claims, liens, charges, other encumbrances, Interests and other interests. Except as otherwise provided in the Plan, on and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Retained Causes of Action without supervision or approval of this Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Failure to include a Cause of Action on the Retained Causes of Action Schedule shall not constitute a waiver or release of such Cause of Action.

## E. Continued Corporate Existence

12. Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and the New Organizational Documents.

## F. Distributions

13. The Debtors, the Reorganized Debtors, and the Disbursing Agents, as applicable, are authorized and directed to make all distributions under the Plan pursuant to the terms of the Plan and to pay, as applicable, any fees and expenses approved by this Order or any other order of this Court. Notwithstanding anything to the contrary in this Order or the Plan, the Debtors, the Reorganized Debtors, and the Disbursing Agents, as applicable, shall make all such distributions to (i) the applicable holders of Allowed Claims as set forth in the Plan or (ii) if noticed by any

such holder no later than 5 business days prior to the applicable Distribution Date, such holder's designee to the extent reasonably practicable and as otherwise set forth in the Plan.

## G. Implementation of the Plan

14. Pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, on or prior to (if specifically so provided herein) the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors or Reorganized Debtors, as applicable, may take all actions that may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the issuance of all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, and the consummation of one or more corporate transactions, as shall be provided for, described in, or contemplated by the Definitive Documents; (b) causing any Reorganized Debtor to be merged into another Reorganized Debtor (or an affiliate of a Reorganized Debtor) or dissolving any Reorganized Debtor; (c) any actions consistent with or reasonably necessary to implement the terms of the Restructuring Transactions; (d) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan (including the Definitive Documents) and that satisfy the requirements of applicable law; (e) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and the Definitive Documents and having other terms for which the applicable parties agree; (f) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provisional law; and (g)

all other actions that the Reorganized Debtors determine to be necessary or appropriate and that are not inconsistent with the Plan.

15. All actions taken or caused to be taken consistent with the terms of the Confirmation Order and the Plan, including any such actions taken with respect to the Restructuring Transactions prior to the date of entry of the Confirmation Order, shall be deemed to have been authorized and approved by this Court without further approval, act or action under any applicable law, order, rule or regulation.

16. New Equity Interests. On the Effective Date, the Reorganized Parent is authorized to issue and deliver (or cause to be issued and delivered) the New Equity Interests without the need for any further corporate or shareholder action, subject to Article IV.L of the Plan. The New Equity Interests, when so issued and delivered, shall be duly authorized, validly issued, fully paid and non-assessable. Subject to Article VI.B of the Plan (New Equity Interests Reserve), Article VI.M of the Plan (L/C Reserve), and Article VI.N of the Plan (Revolving L/C Reserve), on the Effective Date, one hundred percent (100%) of the New Equity Interests shall be held by the holders of Allowed First Lien Secured Claims (subject to dilution by any New Equity Interests issued as Exit Facility Participation Consideration, to Backstop Parties in accordance with the Backstop Commitment Letter, including New Equity Interests issued as Backstop Consideration, or under any Management Incentive Plan).

17. On the Effective Date, Distributions of any Reserved Interests shall be made to the New Equity Interests Reserve. Any Reserved Interests shall be held in the New Equity Interests Reserve, and the Disbursing Agent shall distribute any such Reserved Interests to the applicable Reserve Holders only at the following time: (a) as soon as reasonably practicable following the date on which the Reorganized Debtors (i) obtain approval from FERC under

section 203 of the FPA as required to distribute the Reserved Interests to the Reserve Holder or (ii) determine in their reasonable judgment on the advice of counsel that such approval is not required or (b) as soon as reasonably practicable following the date on which such New Equity Interests no longer constitute Reserved Interests.

18. Exit Facility. On the Effective Date, the Reorganized Debtors are authorized to enter into the Exit Facility and execute the Exit Facility Documents or any other document necessary to effectuate the Exit Facility, without the need for any further corporate action and without the need for any further corporate or organizational action or approval of this Court. The Reorganized Debtors shall be authorized to borrow under the Exit Facility and shall use the proceeds of the Exit Facility for any purpose permitted thereunder. The Reorganized Debtors shall pay, as and when due, all fees, expenses, losses, damages, indemnities and other amounts provided for under the Exit Facility Documents.

19. Entry of this Order shall be deemed (a) approval (or, to the extent previously approved by a Final Order of this Court, ratification) of the Exit Facility and of all transactions contemplated thereby, including performance under the Backstop Commitment Letter and the payment of the Backstop Consideration, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, expenses, losses, damages, indemnities and other amounts provided for by the Exit Facility Documents, and (b) authorization (or, to the extent previously authorized by Final Order of this Court, ratification of such authorization) for the Reorganized Debtors to enter into and perform under the Exit Facility Documents, including the Backstop Commitment Letter. Obligations incurred under the Exit Facility Documents shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.

The financial accommodations to be extended and the obligations to be incurred under the Exit Facility Documents are deemed to have been extended or incurred in good faith and for legitimate business purposes; shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever; and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

20. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed granted and approved; (b) shall be legal, binding and enforceable Liens on, and security interests in, the collateral specified thereunder; (c) shall be deemed properly perfected; (d) shall have the priorities set forth in the Exit Facility Documents; (e) shall be deemed to have been the result of good faith, arm's-length negotiations among, without limitation, the Debtors, the administrative, collateral, and depositary agents, and the lenders under the Exit Facility Documents, (f) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever; and (g) shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. To the extent provided in the Exit Facility Documents, the holder(s) of Liens under the Exit Facility Documents are authorized to file, with the appropriate authorities, financing statements and other documents, to take possession of or control, or to take any other action in order to evidence, validate and perfect such Liens or security interests.

21. Disbursing Agent. The Debtors (with the prior written consent of the Required Consenting Creditors) and the Reorganized Debtors, as applicable, shall designate one or more Entities (which may be the Reorganized Debtors) to effectuate the Distributions. If the

Disbursing Agent is a third party, the reasonable fees and expenses of the Disbursing Agent shall be paid by the Debtors or Reorganized Debtors following submission of statements. The payment of the reasonable fees and expenses of the Disbursing Agent shall be made in the ordinary course of business without any further notice to any party or action, order or approval of this Court. The Disbursing Agent shall be deemed exculpated and indemnified by the Estates, except for any liability arising from fraud, ultra vires actions, willful misconduct, criminal conduct or gross negligence by the Disbursing Agent or any of its agents or representatives.

22. GenOn Exit Facility Payment. Immediately following the Effective Date, in exchange for good and valuable consideration, including the release and discharge of certain claims and Causes of Action against the Debtors, the provision of operation, maintenance, management, administrative and other services in the Chapter 11 Cases, and the facilitation of the orderly transition of operations from GenOn to the Reorganized Debtors or their designees, the GenOn Exit Facility Payment shall be made to GenOn from the proceeds of the Exit Facility. At least three Business Days prior to the Effective Date, GenOn shall provide to the Debtors the aggregate asserted amount of the GenOn Transition and Releases Fee, together with a reasonably detailed calculation of the same, based on the categories set forth in the definition thereof.

23. On the Effective Date, all notes, certificates, Securities, and other instruments evidencing any Claim or Interest shall be considered uncollectible accounts and shall be deemed canceled, surrendered, and of no further force and effect against any Debtor or Reorganized Debtor, without any further action on the part of the Debtors or the Reorganized Debtors; *provided, however*, that, solely for the purposes of preserving the rights relating to the Consenting Creditor Preserved Claims, notwithstanding the occurrence of the Effective Date, (i) the Credit Agreement shall remain in effect subject to the discharge and injunction provisions of

the Confirmation Order and (ii) neither the occurrence of the Effective Date nor any other event in the Chapter 11 Cases shall otherwise affect or prejudice any claim or defense in litigation of any Preserved Claim (as defined in the Claims Preservation Agreement), regardless of whether the Amended and Restated Limited Liability Company Agreement of Shawville Power, LLC has been amended or is no longer in effect at any time. Notwithstanding anything to the contrary herein, in the Plan, or the Plan Supplement (including without limitation Article X.E of the Plan), (x) to the extent not previously paid by the Debtors, on or as soon as practical after the Effective Date, the Reorganized Debtors shall pay in full in Cash all Agent Expenses that are (i) incurred before the Effective Date to the extent invoiced prior to the Effective Date and (ii) incurred after the Effective Date solely to the extent invoiced and incurred as a result of services provided in connection with any action requested by the Reorganized Debtors or required to effectuate Distributions as required by the Plan, or otherwise with the consent of the Reorganized Debtors in their discretion (which payment is hereby authorized), and (y) the rights and obligations of non-Debtor parties as among other non-Debtor parties pursuant to the Loan Documents and other notes, instruments, certificates and other documents evidencing Claims or Interests shall be preserved to the extent such rights and obligations (i) solely as among Prepetition Revolving L/C Issuers and Revolving Loan Lenders (as defined in the Credit Agreement), relate to Revolving Letters of Credit and any Revolving Loans (as defined in the Credit Agreement) relating thereto, including without limitation rights and obligations pursuant to Sections 2.1.3 and 2.6 of the Credit Agreement, or (ii) would otherwise survive pursuant to the terms of such Loan Documents or other notes, instruments, certificates or other documents evidencing Claims or Interests.

24. Registration Rights Agreement. If elected by the Required Consenting Creditors, on the Effective Date, the Registration Rights Agreement shall be executed by the Reorganized Parent and the other parties thereto and shall be valid, binding, and enforceable in accordance with its terms.

25. New Castle HRCO. On the Effective Date, (i) unless the New Castle HRCO is accelerated, terminated or liquidated by Tenaska prior to the Effective Date, reorganized Heritage Power Marketing, LLC shall be deemed to have assumed the New Castle HRCO under sections 365 and 1123 of the Bankruptcy Code without any further order of this Court, and (ii)(A) if agreed to by Tenaska, the reorganized Heritage Power Marketing, LLC shall execute the New Castle HRCO Amendment or (ii)(B) if Tenaska is unwilling or unable to consent to the execution of the New Castle HRCO Amendment on the terms set forth in the Plan and in the Restructuring Support Agreement, the reorganized Heritage Power Marketing, LLC shall execute the New Castle Contribution Agreement. If the New Castle Contribution Agreement is executed pursuant to Article IV.Q of the Plan, then entry of this Order shall be deemed (a) approval of the New Castle Contribution Agreement and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and (b) authorization for the Reorganized Debtors to enter into and perform under the New Castle Contribution Agreement. Obligations incurred under the New Castle Contribution Agreement (if the New Castle Contribution Agreement is executed) shall (i) constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms and (ii) not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not

constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

26. On the Effective Date, if the New Castle Contribution Agreement is executed pursuant to Article IV.Q of the Plan, all of the Liens and security interests to be granted in accordance with the New Castle Contribution Agreement (a) shall be deemed granted and approved by this Court; (b) shall be legal, binding and enforceable Liens on, and security interests in, the collateral specified thereunder; (c) shall be deemed properly perfected; (d) shall have the priorities set forth in the New Castle Contribution Agreement; (e) shall be deemed to have been the result of good faith, arm's-length negotiations between the parties thereto; (f) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever; and (g) shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

27. L/C Facilities. If elected by the Required Consenting Creditors, the applicable Reorganized Debtors are authorized to enter into the New L/C Facility and shall execute the New L/C Facility Documents and any other document to effectuate the New L/C Facility. The Reorganized Debtors shall be authorized to request issuance of letters of credit under the New L/C Facility for any purpose permitted thereunder. The Reorganized Debtors shall, without need for any further corporate action or approval of this Court, pay, as and when due, all fees, expenses, losses, damages, indemnities and other amounts provided for under the New L/C Facility Documents (if any).

28. If the New L/C Facility Documents are executed on or after the Effective Date by the applicable Reorganized Debtors pursuant to Article IV.R of the Plan, as of the Effective

Date, then entry of this Order shall be deemed (a) approval of the New L/C Facility (including all terms and conditions thereof) and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including any replacement of any or all Project L/Cs (as defined in the Credit Agreement) or Revolving Letters of Credit and payment of all fees, expenses, losses, damages, indemnities and other amounts provided for by the New L/C Facility Documents, and (b) authorization for the Reorganized Debtors to enter into and perform under the New L/C Facility Documents. On and after the Effective Date and upon execution of the New L/C Facility Documents, the obligations incurred under the New L/C Facility Documents shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, effective and enforceable in accordance with their terms. The financial accommodations to be extended and the obligations incurred under the New L/C Facility Documents shall be deemed to have been extended or incurred, in good faith and for legitimate business purposes; shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. To the extent provided in the New L/C Facility Documents, the holder(s) of Liens under the New L/C Facility Documents are authorized to file, with the appropriate authorities, financing statements and other documents, to take possession of or control, or to take any other action in order to evidence, validate and perfect such Liens or security interests.

29. If the New L/C Facility Documents are executed on or after the Effective Date by the applicable Reorganized Debtors pursuant to Article IV.R of the Plan, then as of the Effective Date all of the Liens and security interests to be granted in accordance with the New L/C Facility

(a) shall be deemed granted and approved by this Court; (b) shall be valid, legal, binding and enforceable Liens on, and security interests in, the collateral specified thereunder; (c) shall be deemed properly perfected; (d) shall have the priorities set forth in the New L/C Facility Documents; (e) shall be deemed to have been the result of good faith, arm's-length negotiations between the parties thereto; (f) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever; and (g) shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

30. Regardless of whether a New L/C Facility is established, if GenOn makes any payment pursuant to the GenOn Participation to Macquarie or any of its Affiliates or any other Person or Entity on account of a drawing of a letter of credit under Macquarie's Project L/C Loan Commitment occurring after the Effective Date, then the Reorganized Debtors shall make an L/C Reimbursement Payment, solely as required in the Plan and Restructuring Support Agreement; provided, that, if and to the extent that any such reimbursement payment is made by the Debtors or Reorganized Debtors, GenOn shall be deemed to have waived its pro rata share of any such L/C Reserve Distribution under the terms of the GenOn Participation to the extent the L/C Reimbursement Payments were received and retained by GenOn.

31. L/C Reserve. In the event that (i) no New L/C Facility is entered into replacing the Project L/Cs (as defined in the Credit Agreement) prior to the Effective Date and (ii) all or a portion of the Project L/Cs (as defined in the Credit Agreement) remain outstanding and undrawn on the Effective Date, then on the Effective Date, the Disbursing Agent shall fund the L/C Reserve with the L/C Reserve Distribution. If the L/C Reserve is funded with the L/C Reserve Distribution and any such undrawn Project L/Cs (as defined in the Credit Agreement)

shall become drawn and actually funded by the Project L/C Issuer (as defined in the Credit Agreement) after the Effective Date (such Project L/Cs that have been drawn and funded following the Effective Date, the "Post-Effective Date Drawn L/Cs"), then, subject to the provisions of this Order, the Disbursing Agent shall make a distribution from the L/C Reserve to the applicable Project L/C Issuer (as defined in the Credit Agreement) of such Post-Effective Date Drawn L/Cs to the extent that (i) such Project L/C Issuer (as defined in the Credit Agreement) would have had an Allowed L/C Reimbursement Claim on account of such Post-Effective Date Drawn L/C had it been drawn prior to the Effective Date and (ii) (x) no L/C Reimbursement Payments were made on account of such Post-Effective Date Drawn L/C or (y) the L/C Reimbursement Payments made on account of such Post-Effective Date Drawn L/C were subsequently subject to any contest, attack, avoidance, recoupment, deduction, recharacterization, clawback, turnover, subrogation, disgorgement, reversionary interest, or any other similar economic or liability exposure for whatever reason and were in fact disgorged by GenOn or not otherwise retained by GenOn; provided that, the Debtors may object to the allowance of any L/C Reimbursement Claim solely on the "Reserved Matters" (as such term is defined in the Cash Collateral Order docketed at ECF No. 118 in the Chapter 11 Cases). Any such distribution shall be in an amount equal to what would have been such Project L/C Issuer's First Lien Distribution on account of such Post-Effective Date Drawn L/C had it been drawn prior to the Effective Date. Notwithstanding anything to the contrary herein, any portion of any L/C Reserve Distribution received by a Project L/C Issuer (as defined in the Credit Agreement) of a Project L/C (as defined in the Credit Agreement) shall be subject in all respects to the Plan, Confirmation Order, and all other documents related thereto, including the Exit Facility Participation Procedures, including that any rights to exercise the Exit Facility Participation

Consideration shall be subject to and limited by the election deadlines applicable thereto. On the date on which there are no longer any Project L/Cs (as defined in the Credit Agreement) that remain outstanding (whether because they have been replaced or terminated pursuant to their terms or for any other reason), any L/C Reserve Distribution held in the L/C Reserve, including any New Equity Interests, shall automatically be extinguished and cancelled. Reorganized Parent shall hold the New Equity interests relating to the L/C Reserve as Disbursing Agent and for tax purposes Reorganized Parent will be treated as the owner of such New Equity Interests unless any such interests are issued to Holders of Claims.

32. Revolving L/C Reserve. In the event that (i) no New L/C Facility is entered into replacing the Revolving Letters of Credit prior to the Effective Date and (ii) all or a portion of the Revolving Letters of Credit remain outstanding and undrawn on the Effective Date, then on the Effective Date, the Disbursing Agent shall fund the Revolving L/C Reserve with the Revolving L/C Reserve Distribution. If the Revolving L/C Reserve is funded with the Revolving L/C Reserve Distribution and any such undrawn Revolving Letters of Credit shall become drawn and actually funded by a Prepetition Revolving L/C Issuer after the Effective Date (such Revolving Letters of Credit that have been drawn and funded following the Effective Date, the "Post-Effective Date Drawn Revolving L/Cs"), then the Disbursing Agent shall make a distribution from the Revolving L/C Reserve to the Prepetition Revolving L/C Issuer of such Post-Effective Date Drawn Revolving L/Cs to the extent that such Prepetition Revolving L/C Issuer would have had an Allowed L/C Reimbursement Claim on account of such Post-Effective Date Drawn Revolving L/C had it been drawn prior to the Effective Date. Any such distribution shall be in an amount equal to what would have been such Prepetition Revolving L/C Issuer's First Lien Distribution on account of such Post-Effective Date Drawn Revolving L/C had it been

drawn prior to the Effective Date. Notwithstanding anything to the contrary herein, any portion of any Revolving L/C Reserve Distribution received by a Prepetition Revolving L/C Issuer of a Revolving Letter of Credit shall be subject in all respects to the Plan, Confirmation Order, and all other documents related thereto, including the Exit Facility Participation Procedures, including that any rights to exercise the Exit Facility Participation Consideration shall be subject to and limited by the election deadlines applicable thereto. On the date on which there are no longer any Revolving Letters of Credit that remain outstanding (whether because they have been replaced or terminated pursuant to their terms or for any other reason), any Revolving L/C Reserve Distribution held in the Revolving L/C Reserve, including any New Equity Interests, shall automatically be extinguished and cancelled. Reorganized Parent shall hold the New Equity interests relating to the Revolving L/C Reserve as Disbursing Agent and for tax purposes Reorganized Parent will be treated as the owner of such New Equity Interests unless any such interests are issued to Holders of Claims.

33. Shawville Lease Documents. On or prior to the Effective Date, the Shawville Lease Documents Amendments shall be executed by the applicable Debtors or Reorganized Debtors.

34. Transition Services Agreement. On the Effective Date, the Reorganized Debtors shall be deemed to have assumed the Transition Services Agreement under sections 365 and 1123 of the Bankruptcy Code without any further order of this Court (to the extent the Transition Services Agreement is still in effect). In accordance with the Transition Services Agreement and subject to the terms thereof, the Debtors or their designee(s) shall assume GES's obligations under the collective bargaining agreements (other than any obligations regarding pensions and other post-employment benefits) and shall make offers to employ the Heritage Dedicated

Employees (as such term is defined in the Transition Services Agreement) as required by Section 2.11(b) of the Transition Services Agreement. In addition, if requested by the Required Consenting Creditors, GenOn will provide (i) continued management of the Debtors and the Reorganized Debtors and (ii) personnel to continue to serve as officers or other management personnel of the Debtors or the Reorganized Debtors, as applicable, in each case while the Transition Services Agreement is in effect and solely in accordance with the terms of the Transition Services Agreement.

35. Replacement Operator Agreements. The Replacement Operator Agreements are approved, and the Debtors and Reorganized Debtors, as applicable, are authorized to enter into and perform under the Replacement Operator Agreements without any further order of this Court.

36. New Revolving Loan Facility. If elected by the Required Consenting Creditors, the Reorganized Debtors are authorized to, and shall, enter into the New Revolving Loan Facility and execute the New Revolving Loan Facility Documents and any other document to effectuate the New Revolving Loan Facility, without the need for any further corporate or organizational action or approval of this Court. If the New Revolving Loan Facility is entered into by the applicable Reorganized Debtors, as of the Effective Date, then all of the Liens and security interests to be granted in accordance with the New Revolving Loan Facility Documents, shall constitute valid, binding, effective, enforceable, and automatically properly perfected Liens on the collateral specified in the New Revolving Loan Facility Documents. To the extent provided in the New Revolving Loan Facility Documents, the holder(s) of Liens thereunder are authorized to file, with the appropriate authorities, financing statements and other documents, to take possession of or control, or to take any other action in order to evidence, validate and perfect

such Liens or security interests. If the New Revolving Loan Facility is entered into by the applicable Reorganized Debtors, the guarantees, mortgages, pledges, Liens and other security interests granted to secure the obligations arising under the New Revolving Loan Facility Documents are deemed granted in good faith, for legitimate business purposes and for reasonably equivalent value, as an inducement to the lenders thereunder to extend credit thereunder, and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, and shall not otherwise be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purpose whatsoever under the Bankruptcy Code or applicable non-bankruptcy law, and the priorities of such Liens and security interests shall be as set forth in the New Revolving Loan Facility Documents.

## H. <u>Release of Liens</u>

37. Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan or the Restructuring Transactions, on the Effective Date, subject to receipt of the applicable Distributions, if applicable, all prepetition Liens on and security interests in the property of the Estates shall be fully released and discharged.

38. The Agents shall (i) execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such Liens and security interests, and (ii) authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable.

## I. New Board and Officers of the Reorganized Debtors

39. On the Effective Date, all Persons acting as directors and/or managers of the Debtors that have not been selected as directors and/or managers of the Reorganized Debtors shall be deemed to have resigned, their appointments shall be rescinded for all purposes, and their respective authority and power, in their capacities as such, shall be revoked, in each case, without the necessity of taking any further action in connection therewith.

40. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors have, to the extent reasonably practicable, disclosed in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board, as well as those Persons that will serve as officers of the Reorganized Debtors (if any). To the extent any such director or officer is an "insider" (as defined in the Bankruptcy Code), the nature of any compensation to be paid to such director or officer has also been disclosed to the extent reasonably practicable. The foregoing appointments and elections are hereby approved and ratified as being in the best interests of the Debtors and their creditors and consistent with public policy, and such managers and directors hereby are deemed elected and appointed to serve in their respective capacities as of the Effective Date without further action in connection therewith.

41. The New Board members shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the Reorganized Parent's New Organizational Documents. As of the Effective Date, each Reorganized Debtor shall be authorized to procure and maintain directors' and officers' liability insurance policies for the benefit of its directors, officers, members, trustees and managers in the ordinary course of business.

42. Following the Effective Date, the New Board shall have the authority to determine all terms and conditions (including with respect to allocation, form, structure, participation, and vesting), and direct the implementation, of any Management Incentive Plan, in each case, subject to the terms of the New Organizational Documents.

**J. Intercompany Claims**

43. On the Effective Date and without the need for any further corporate action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, all Intercompany Claims shall be reinstated, adjusted, or cancelled, as determined by the Debtors with the consent of the Required Consenting Creditors.

**K. Provisions Related to Executory Contracts**

44. In accordance with Article V of the Plan and except as otherwise provided in the Plan or this Order, as of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed assumed, together with all amendments agreed to in writing between the applicable Debtor(s) and the Executory Contract or Unexpired Lease counterparty, unless an Executory Contract or Unexpired Lease (i) was previously assumed or rejected pursuant to a Final Order of this Court, (ii) is listed on the Rejection Schedule or (iii) is the subject of a motion filed by a Debtor for assumption or rejection under section 365 of the Bankruptcy Code that is pending before this Court or subject to a pending appeal.

45. Notwithstanding anything to the contrary in the Plan, (i) the Debtors shall have the right to alter, amend, modify, or supplement the Rejection Schedule at any time until the Effective Date, and (ii) the Reorganized Debtors shall have the right to alter, amend, modify, or supplement the Rejection Schedule at any time from the Effective Date through and including 45 days after the Effective Date.

46. Cure Claims under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date or as soon as reasonably practicable thereafter by the applicable Reorganized Debtor(s), or on such other terms as the parties to any particular Executory Contract or Unexpired Lease may agree.

47. Entry of this Order shall constitute, effective as of the Effective Date (unless otherwise indicated or provided in a separate order of this Court), and subject to the payment of the applicable Cure Claim, if any, and the resolution of any cure dispute, approval of the rejections, assumptions, and assumptions and assignments of Executory Contracts and Unexpired Leases provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by order of this Court but not assigned to a third party before the Effective Date shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of this Court authorizing its assumption, or applicable law.

48. Each Executory Contract and Unexpired Lease rejected pursuant to the Plan shall be deemed rejected as of the Effective Date, unless otherwise indicated herein or on the Rejection Schedule.

49. With respect to each Executory Contract or Unexpired Lease to be assumed or assumed and assigned by the Debtors, unless otherwise determined by this Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, the dollar amount required to cure any defaults of the Debtors existing as of the Confirmation Date shall be the amount indicated in the *Notice of Cure Claims Associated with Executory Contracts and*

*Unexpired Leases that May be Assumed by the Debtors Pursuant to the Plan and Related Procedures in Connection Therewith* [Docket No. 473] (the "Cure Notice"). Consistent with the Cure Notice, the Cure Claim is deemed to be $0.00 for all Executory Contracts and Unexpired Leases that are not listed in the Cure Notice. Upon the assumption of an Executory Contract or Unexpired Lease hereunder or under a separate Final Order of this Court and the payment in full of the corresponding Allowed Cure Claim, if any, the proof of Claim based upon such Executory Contract or Unexpired Lease shall be expunged from the claims docket without any further notice to or action by any party or order of this Court. The Cure Notice provided adequate notice of all Cure Claims to holders thereof.

50. Pursuant to the procedures approved by the *Order (I) Approving the Adequacy of the Second Amended Disclosure Statement, (II) Approving the Solicitation, Voting, and Tabulation Procedures, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, (V) Approving Cure Notice and Assumed Contract Objection Procedures and (VI) Granting Related Relief* [Docket No. 455] (the "Disclosure Statement Order"), any and all objections to the assumption of any Executory Contract or Unexpired Lease, including without limitation any objection to the proposed amounts of Cure Claims or the provision of adequate assurance of future performance, were required to be filed with this Court on or before September 25, 2023, at 4:00 p.m. Central Time. Except as provided below, all non-Debtor counterparties to the Executory Contracts and Unexpired Leases that failed to timely object to the Debtors' proposed amounts of Cure Claims or the proposed assumption or assumption and assignment of Executory Contracts and Unexpired Leases are deemed to have consented to such assumption, assumption and assignment and Allowed amount of Cure Claims (including such amount set at zero dollars ($0)), and shall

be forever barred, estopped, and enjoined from challenging the validity of such assumption or assumption and assignment or the amount of such Cure Claim.

51. Unless otherwise provided in the Plan or by separate order of the Court, each assumed Executory Contract or Unexpired Lease shall be assumed together with all executed modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all related easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements, and restatements of Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of such Executory Contracts and Unexpired Leases, or the validity, priority, or amount of any Claims that may arise in connection therewith.

52. Any term of any policy, contract, or other obligation applicable to a Debtor that is conditioned on, or creates an obligation of the Debtor as a result of, any of the following shall be void and of no further force or effect with regard to such Debtor: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan; (d) any change of control resulting from the consummation of the Plan or the issuance of the New Equity Interests; or (e) any Restructuring Transaction.

53. Except as may be provided under a separate order of this Court, any Claim arising from the rejection of an Executory Contract or Unexpired Lease must be filed with the Claims and Noticing Agent by the Rejection Damages Deadline. In the event that an Executory Contract or Unexpired Lease is rejected pursuant to a supplement to the Rejection Schedule filed after the

entry of this Order and in accordance with the terms of this Order, then (i) the effective date of rejection of such Executory Contract or Unexpired Lease shall be the date such supplement to the Rejection Schedule is filed, unless otherwise ordered by the Court, and (ii) the Rejection Damages Deadline with respect to such Executory Contract or Unexpired Lease shall be the date that is 30 days after the filing of such supplement to the Rejection Schedule, unless otherwise ordered by the Court. Any Claim arising from the rejection of an Executory Contract or Unexpired Lease, with respect to which no Proof of Claim is timely filed, shall be automatically disallowed without the need for any objection or further notice to or action or approval of this Court.

54. Holders of Claims arising from the rejection of Executory Contracts or Unexpired Leases with respect to which no Proof of Claim is timely filed shall be forever barred, estopped, and enjoined from asserting a Claim based on such rejection against the Debtors, the Reorganized Debtors, the Estates or the respective property of any of the foregoing, and such Claims shall be discharged as of the Effective Date unless otherwise expressly ordered by this Court.

55. Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. Notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors from the counterparties to rejected Executory Contracts or Unexpired Leases.

56. The assumptions or rejections of the Executory Contracts and Unexpired Leases set forth in the Plan or the Rejection Schedule are approved pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by this Court on or after the Effective Date by a Final Order.

57. All insurance policies, surety bonds, and indemnity agreements to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as Executory Contracts and shall be deemed assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such insurance policy, surety bond, or indemnity agreement is included in the Rejection Schedule. Unless any such insurance policy, surety bond, or indemnity agreement is listed in the Rejection Schedule, nothing in the Plan, including any releases or injunctions, shall diminish or impair its enforceability and such policies, surety bonds, and indemnity agreements shall continue in full force and effect after the Effective Date in accordance with their respective terms.

58. The Cure Claim with respect to the Daily Metered Transportation Service Agreement dated March 20, 2017, between National Fuel Gas Distribution Corporation ("NFGDC") and Heritage Power, LLC (as the assignee of GenOn Energy Management, LLC) (the "NFGDC Agreement") shall be $4,816.45. As of and subject to the occurrence of the Effective Date, the NFGDC Agreement shall be assumed in accordance with the terms of the Plan.

59. The *Recycle the World, Inc.'s Objection to Notice of Cure Claims Associated with Executory Contracts and Unexpired Leases that may be Assumed by the Debtors Pursuant to the*

*Plan and Related Procedures in Connection therewith and Objection to Plan* [Docket No. 531] filed by Recycle the World, Inc. is resolved as set forth in this paragraph. The Cure Claim with respect to the Unexpired Lease between the Debtors and Recycle the World, Inc. shall be no greater than **$39,101.62** and the lease with Recycle the World, Inc. and Titus Power, LLC shall be assumed in accordance with this Order. The Debtors and Recycle the World, Inc. shall work together in good faith to determine the correct amount of the Cure Claim. If the Debtors, with the consent of the Required Consenting Creditors, reach an agreement regarding the correct amount of the Cure Claim, then the Debtors shall file a notice on the docket indicating the amount of such agreed Cure Claim. If the parties are unable to reach an agreement with respect to such Cure Claim within 30 days of the entry of this Order, then Recycle the World, Inc. may request that this Court set the matter for hearing.

## L. Release, Exculpation, Injunction and Discharge Provisions Approved; Discharge of Claims Against and Interests in the Debtors

60. As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan or any Definitive Document and except as otherwise provided in the Plan or in this Order, all injunction, release, discharge and exculpation provisions set forth in the Plan, including but not limited to those contained in Article X of the Plan, are hereby approved, and shall be effective and binding on all Persons and Entities to the extent provided in the Plan, without further order or action by this Court. The Ad Hoc Committee and its Related Parties shall be Released Parties.

61. Except as otherwise provided in the Plan or in this Order, as of the Effective Date, in consideration of the distributions to be made under the Plan, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or an Interest and all successors, assigns, and affiliates of such holder shall be deemed to have forever waived, released, and discharged



4859-0136-3583

the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan or this Order, as of the Effective Date, all holders of Claims and Interests and each of their successors, assigns, and affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim or terminated Interest.

## M. The Litigation Trust

62. On or prior to the Effective Date, if elected by the Required Consenting Creditors, the trustee of the Litigation Trust shall execute the Litigation Trust Agreement for the benefit of the holders of the Litigation Trust Interests, which Litigation Trust Agreement shall be consistent with the Restructuring Support Agreement and the Claims Preservation Agreement. If a Litigation Trust is created pursuant to the terms of the Plan, (a) on the later of (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date on which such Loan Claim becomes Allowed, or as soon as reasonably practicable thereafter, each holder of an Allowed Loan Claim shall be issued its pro rata share (calculated as the proportion of its Allowed Loan Claim to the aggregate amount of all Allowed Loan Claims) of the Litigation Trust Interests and (b) as of the Effective Date, the Administrative Agent shall be deemed to have transferred and assigned all of its right, title and interest in and to all of the Consenting Creditor Preserved Claims, which right, title, and interest shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, charges, Interests and other interests, subject only to the terms of the Claims Preservation Agreement and the Litigation Trust Agreement. Any such transfer and assignment shall be deemed to be effective and valid for all purposes. On the Effective Date, the Litigation Trust, if any, shall become effective for the sole benefit of the

holders of Litigation Trust Interests and shall be deemed to be valid, binding and enforceable in accordance with the terms and provisions of the Plan and the Litigation Trust Agreement. After the Effective Date, the Litigation Trust Agreement, if any, may be amended in accordance with its terms without further order of this Court (provided that any such amendment will be consistent with the Claims Preservation Agreement).

63. The organization and governance of the Litigation Trust (if any), including the identity of the trustee thereunder, shall be determined by the Required Consenting Creditors in their sole discretion (provided that all organizational and governance terms comply in all respects with the terms of the Claims Preservation Agreement, including the restrictions on the issuance and assignability of the Litigation Trust Interests). The Litigation Trust (if any), via its trustee, shall have the authority to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment the Consenting Creditor Preserved Claims, in each case, subject to the Litigation Trust Agreement. No Person or Entity (other than the holders of Litigation Trust Interests to the extent set forth in the Litigation Trust Agreement) shall have the right to direct or otherwise affect the actions of the Litigation Trust or its trustee (if any).

64. If elected by the Required Consenting Creditors prior thereto, on the Effective Date the Litigation Trust (if any) shall be funded with proceeds of the Exit Facility, in all cases in accordance with the Exit Facility Documents (the "Exit Facility Trust Funding"). The members of the New Board and the holders of New Equity Interests (in each case solely in their capacities as such) shall not be subject to any liability to any Person in connection with any action taken or not taken with respect to the Litigation Trust (if any), including in connection with the Exit Facility Trust Funding or any other funding of any such Litigation Trust from any source.

65. Notwithstanding the foregoing, nothing in the Plan is intended, or shall be deemed or construed, to (i) be a waiver of any right, power or remedy under the Claims Preservation Agreement by any party thereto, (ii) be an amendment to or waiver of any term in the Claims Preservation Agreement, (iii) be a consent to any action in violation of or that is otherwise inconsistent with the terms of the Claims Preservation Agreement, or (iv) in any way prevent, prejudice, or impair the rights of any party to the Claims Preservation Agreement to enforce the Claims Preservation Agreement or pursue claims preserved thereunder.

66. The trustee of the Litigation Trust shall distribute, on a periodic basis, to the holders of the Litigation Trust Interests, any net Cash proceeds that may be generated from the Consenting Creditor Preserved Claims, as set forth in the Litigation Trust Agreement.

**N. Claims Resolution Procedures Approved**

67. The procedures for resolving contingent, unliquidated, and/or disputed claims set forth in Article VII of the Plan are hereby approved.

68. On or after the Effective Date, a Proof of Claim may not be amended (other than solely to update or correct the name or address of the holder of such Claim) without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any amended Proof of Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

**O. Professional Compensation**

69. All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date shall be filed and served no later than 30 days after the Effective Date, consistent with Article II.A.1.d. of the Plan; *provided, however*, that ordinary course professionals shall be compensated in accordance with the

Ordinary Course Professionals Fee Order. This Court shall determine the Allowed amounts of all Professional Fee Claims after notice and a hearing in according with the procedures established in the Chapter 11 Cases. Any objections to a Professional Fee Claim must be filed and served on the Debtors and the requesting party no later than 30 days after service of the final request for payment of such Professional Fee Claim. Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment, each holder of an Allowed Professional Fee Claim shall be paid in full in Cash.

70. On or prior to the Effective Date, the Debtors shall fund the Professional Fee Reserve Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Reserve Account shall be maintained in trust for the Professionals. Such funds in the Professional Fee Reserve Account shall not constitute property of the Debtors' Estates, except as otherwise expressly set forth in the last sentence of this paragraph. The Allowed Professional Fee Claims shall be paid in Cash to such Professionals from the funds held in the Professional Fee Reserve Account, without interest or other earnings therefrom, within 3 business days after such Claims are Allowed by an order of this Court; provided that the Debtors' obligation with respect to Professional Fee Claims will not be limited nor be deemed to be limited in any way to the balance of funds held in the Professional Fee Reserve Account. When all Allowed Professional Fee Claims have been paid in full, the Cash remaining in the Professional Fee Reserve Account, if any, shall revert to the Reorganized Debtors, without any further notice to, action, order, or approval of this Court.

71. To receive payment for unbilled fees and expenses incurred through and including the Effective Date, the Professionals shall estimate their accrued Professional Fee Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred

through and including the Effective Date, and shall deliver such reasonable, good-faith estimates to the Debtors and counsel to the Ad Hoc Committee by no later than seven days before the Effective Date; *provided, however*, that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professional. If a Professional does not provide such estimate, the Debtors may estimate in good faith the unbilled fees and expenses of such Professional. The total amount so estimated shall comprise the Professional Fee Reserve Amount. To the extent the Professional Fee Reserve Amount is not sufficient to pay all Allowed Professional Fee Claims in full, the remaining aggregate unpaid amount of the Allowed Professional Fee Claims shall be paid by the Reorganized Debtors.

72. Consenting Stakeholder Fees and Expenses. Without the filing of any retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or review or approval by this Court, (i) on the Effective Date, the Reorganized Debtors shall pay in full in Cash any outstanding Consenting Stakeholder Fees and Expenses that are invoiced at least three (3) Business Days prior to the Effective Date and (ii) any Consenting Stakeholder Fees and Expenses invoiced thereafter shall be paid in accordance with the Restructuring Support Agreement.

73. Administrative Agent Fees and Expenses. Without the filing of any retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or review or approval by this Court, on the Effective Date, the Reorganized Debtors shall pay in full in Cash any outstanding Administrative Agent Fees and Expenses that are invoiced at least three (3) Business Days prior to the Effective Date.

**P. <u>Post-Effective Date Fees and Expenses</u>**

74. From and after the Effective Date, the Reorganized Debtors may, in the ordinary course of business and without any further notice to or action, order or approval of this Court, pay in Cash the legal, professional or other fees and expenses related to the implementation and consummation of the Plan incurred by the Reorganized Debtors or any professional following the Effective Date. Upon the Effective Date, any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of this Court.

**Q. <u>Exemption from Securities Laws</u>**

75. To the extent the New Equity Interests are Securities, the issuance and distribution of the New Equity Interests on account of the Allowed First Lien Secured Claims (including with respect to Exit Facility Participation Consideration) and issued as Backstop Consideration shall be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code. To the extent section 1145 is unavailable, including for any New Equity Interests that are issued to the Backstop Parties as Exit Facility Participation Consideration for the portion of the Exit Facility that was unsubscribed and funded by a Backstop Party (including any New Equity Interests that are issued to the Backstop Parties in connection with the Backstop Holdback), issuance and distribution of the New Equity Interests (if Securities) shall be exempt from registration pursuant to section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation

D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements and such similar federal, state and local laws.

76. All New Equity Interests authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code), subject to: (1) compliance with any rules and regulations of the SEC or other federal, state, local or and foreign securities laws applicable at the time of any future transfer of such New Equity Interests, and obtaining any applicable regulatory approvals and (2) the transfer restrictions set forth in the New Organizational Documents, if any, including any FERC-related transfer restrictions.

**R. <u>Retention of Causes of Action</u>**

77. Except as otherwise provided in Article X of the Plan or the other provisions of the Plan, as of the Effective Date, each Cause of Action of the Debtors shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the applicable Reorganized Debtor. Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or by order of this Court, the Debtors or Reorganized Debtors, as applicable, expressly reserve such Cause of Action for later adjudication and, accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of the Confirmation, the Plan, the vesting of such Cause of Action in the Reorganized Debtors, any order of this Court, occurrence of the Effective Date, or these Chapter 11 Cases. **No Person may rely on the absence of a specific reference in the**

**Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or Reorganized Debtors, as applicable, will not pursue such Cause of Action.** Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain the Retained Causes of Action that the Debtors or the Estates may hold against any Person or Entity to the extent included, referenced, identified, or preserved in the Retained Causes of Action Schedule and not released under Article X.E of the Plan, including the Avoidance Actions and may, in their sole discretion, pursue or settle any such Retained Causes of Action. The inclusion or failure to include any Retained Cause of Action in the Plan Supplement shall not be deemed an admission, denial or waiver of any claims, rights or Causes of Action that any Reorganized Debtor may hold against any Person or Entity. The Retained Causes of Action shall not include any Claims or Causes of Action against any Released Party to the extent released under Article X.E of the Plan.

**S. Setoffs and Recoupments**

78. Except with respect to Claims released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disbursing Agent and/or the Reorganized Debtors, as applicable, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off any Allowed Claim (and the Distributions to be made on account of such Claim) against all counterclaims, rights and Causes of Action of any nature that the applicable Debtor may have against the holder of such Claim or exercise recoupment with respect thereto; provided, however, that the failure to

effectuate such setoff or recoupment shall not constitute a waiver or release by the applicable Debtor of any Cause of Action against any holder of a Claim.

79. In no event shall any holder of a Claim or Interest be entitled to set off or exercise recoupment in relation to any claim, right, or Cause of Action of any Debtor or Reorganized Debtor, unless (a) the Debtors (with the consent of the Required Consenting Creditors) or Reorganized Debtors, as applicable, have consented or (b) on or before the Effective Date, (i) this Court has entered a Final Order granting a motion filed by such holder requesting the authority to perform such setoff or recoupment or (ii) such holder has actually performed such recoupment and provided prior notice thereof, in each case, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff or recoupment.

**T. Miscellaneous Provisions**

80. PJM Settlement. On September 26, 2023, the Debtors filed the *Notice of Filing of PJM Settlement Term Sheet* [Docket No. 536] (the "PJM Settlement Notice"). Attached to the PJM Settlement Notice as Exhibit A is the PJM Settlement Term Sheet dated as of September 26, 2023, by and among the Debtors (with the consent of the Required Consenting Creditors in accordance with the terms of the Restructuring Support Agreement), PJM Interconnection, L.L.C. and PJM Settlement, Inc. (the "PJM Settlement Term Sheet"). The settlement in the PJM Settlement Term Sheet is approved in its entirety and is incorporated into the Plan and this Order by reference in full. The entry of this Order constitutes this Court's approval of the settlement terms reflected in the PJM Settlement Term Sheet. The Debtors and the Reorganized Debtors as the case may be are authorized to perform and consummate the transactions contemplated under the PJM Settlement Term Sheet.

81. Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Governmental Units shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtors, or another Person or Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

82. Project L/C Issuer Fees and Expenses. Without the filing of any retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or review or approval by this Court, on the Effective Date, the Reorganized Debtors shall pay in full in Cash all unpaid reasonable and documented fees and expenses of King & Spalding, as counsel to Macquarie Bank Limited, in its capacity as Project L/C Issuer (as defined in the Credit Agreement), that are invoiced at least three (3) Business Days prior to the Effective Date, solely to the extent such fees and expenses are required to be paid by the Debtors under the Loan Documents, were incurred after the commencement of the Chapter 11 Cases and prior to the Effective Date and relate to the Debtors or their capital structure, the Restructuring Transactions, the Definitive Documents, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing.

83. J. Aron. J. Aron & Company LLC ("J. Aron") and its Related Parties shall grant the releases contained in the Plan, provided that the claims (if any) of any affiliate of J. Aron over which J. Aron does not directly or indirectly exercise control shall not be deemed to be

released pursuant to the Plan or this Order. On the Effective Date, the Claim asserted in the Proof of Claim filed by J. Aron in the Chapter 11 Cases shall be deemed Allowed in the amount of $101,203,639, solely to the extent J. Aron fully complies with the obligations set forth in the Backstop Commitment Letter that have accrued on or prior to the Effective Date (including in the Exit Term Loan Term Sheet attached thereto).

84. Consent Rights. Notwithstanding anything in this Order to the contrary, prior to the Effective Date, (i) any and all consent rights of all parties to the Restructuring Support Agreement under such agreement with respect to the form and substance of the Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements or documents, and any consents, waivers, or other deviations under or from any such agreements or documents, as more fully set forth in the Restructuring Support Agreement, are incorporated herein by this reference and shall be fully enforceable as if stated in full herein, and (ii) to the extent provided in the Restructuring Support Agreement, any action or inaction that may be taken by the Debtors hereunder shall require the consent of the parties to the Restructuring Support Agreement. Any settlement of any Claim or agreement by a holder of a Claim to accept less favorable treatment shall, to the extent effectuated on or before the Effective Date, require the prior written consent of the Required Consenting Creditors. Notwithstanding anything in the Plan to the contrary, failure to reference herein any right, privilege or obligation provided for by the Restructuring Support Agreement shall not impair any such right, privilege or obligation. In the event of any inconsistency between this paragraph and any other provision of this Order, this paragraph shall control.

85. Upon entry of this Order, the Debtors, the Reorganized Debtors, the Disbursing Agent, the Litigation Trustee or any other Person or Entity having duties or responsibilities under

the Plan, the Definitive Documents, or this Order, and their respective directors, officers, general partners, agents, trustees, representatives, or attorneys or other advisors are specifically authorized, empowered, and directed to take any and all actions necessary or appropriate to implement, effectuate, and consummate the Plan, the Restructuring Transactions, the Definitive Documents, and the terms of this Order and the respective transactions contemplated thereby, all in accordance with the respective terms thereof, and are authorized and directed to take all steps necessary and appropriate to implement the Plan without the need for further approvals in connection therewith.

86. This Order is in recordable form and shall be accepted by any filing or recording officer or authority of any applicable governmental unit for filing and recording purposes without further or additional orders, certifications, or other supporting documents. Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, mortgages, or instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Order.

87. Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, including, without limitation, the issuance of the New Equity Interests, (b) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (c) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, assignment or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan, (d) the grant of collateral under

any of the Definitive Documents, (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, this Order, and (f) the transfer of the Consenting Creditor Preserved Claims to the Litigation Trust, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to this Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

88. To the extent that, under applicable non-bankruptcy law, any of the actions contemplated in the Plan would otherwise require the consent or approval of the holders of Interests in the Debtors, this Order shall constitute such consent or approval, and such actions shall be, and are deemed to have been, taken by unanimous action of the holders of Interests in the Debtors.

89. Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Order, the Plan, the Definitive Documents, and all other agreements and documents executed and delivered pursuant to the Plan shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

90. The Debtors and the Reorganized Debtors shall have the right, to the full extent permitted by section 1142 of the Bankruptcy Code, to apply to this Court for an order, notwithstanding any otherwise applicable non-bankruptcy law, directing any appropriate Person or Entity to execute and deliver an instrument or perform any other act necessary to implement the Plan or the provisions of this Order.

91. This Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Plan and the Definitive Documents, and any other documents, instruments, agreements, any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Definitive Documents.

92. On and after the Effective Date, this Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases, including, without limitation, over the matters set forth in Article X and Article XI of the Plan, provided that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement or any other Definitive Documents, in each case, that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court or arbitration, or allows Persons or Entities to bring disputes to a different court or demand arbitration, and any disputes concerning documents contained in the Plan Supplement or any other Definitive Document that contain such clauses shall be governed in accordance with the provisions of such documents.

93. If any or all of the provisions of this Order are hereafter stayed, reversed, modified, or vacated by subsequent order of this Court or any other court of competent jurisdiction, such stay, reversal, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or

undertaken by the Debtors, the Reorganized Debtors, or any other Person or Entity authorized or required to take action to implement the Plan, as applicable, prior to the effective date of such stay, reversal, modification, or vacatur. Notwithstanding any such stay, reversal, modification, or vacatur of this Order, any such act, obligation, indebtedness, liability, priority, or lien shall be governed in all respects by the provisions of this Order, the Plan, and all documents, instruments and agreements related thereto or any amendments or modifications thereto, and shall remain binding on the Debtors or the Reorganized Debtors, as the case may be. The failure to include specifically any particular provision of the Plan in this Order shall not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of the Court that the Plan is confirmed in its entirety and that its provisions are incorporated by reference herein (to the extent not otherwise modified herein).

94. The provisions of the Plan and this Order, including the Findings and Conclusions and the Plan's release, injunction, exculpation, and compromise provisions, are integrated with each other, non-severable and mutually dependent.

95. All fees payable pursuant to 28 U.S.C. § 1930 before the Effective Date, shall be paid by each of the Debtors in full on the Effective Date. Fees payable pursuant to 28 U.S.C. § 1930 on or after the Effective Date shall be paid by the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) until the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

96. On the Effective Date and following the payment of all amounts payable under the Plan on the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

97. This Order is a final order, and the period in which an appeal thereof must be filed shall commence upon its entry. The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of 14 days after entry of the order are hereby waived. This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062.

98. In the event of a conflict between the terms and conditions of this Order, the Plan, the Definitive Documents, and/or any other document executed or effectuated in connection with the Plan, the provisions of this Order shall control.

99. On the Effective Date, the Debtors shall File a notice of the occurrence of the Effective Date (the "Notice of Effective Date") with this Court. As soon as practicable after the occurrence of the Effective Date, the Reorganized Debtors shall serve the Notice of Effective Date on all holders of Claims and Interests, the U.S. Trustee, and other parties in interest by first class United States mail.

100. The United States and the Commonwealth of Pennsylvania, Department of Environmental Protection opt out of the releases provided in Article X.E. of the Plan and are not Releasing Parties.

101. Nothing in this Order or the Plan discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any police or regulatory liability to a Governmental Unit that any entity would be subject to as the owner or operator of property after the Effective Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors or Reorganized Debtors. Nor shall anything in this Order or the Plan

enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence. Nothing in this Order or the Plan shall affect any setoff or recoupment rights of any Governmental Unit to the extent provided under section 553 of the Bankruptcy Code. Nothing in the Plan or Confirmation Order shall authorize the transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization, (v) certification, or (vi) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under police or regulatory law.

102. In no event shall any holder of a Claim or Interest be entitled to set off or exercise recoupment in relation to any claim, right, or Cause of Action of any Debtor or Reorganized Debtor, unless (a) the Debtors (with the consent of the Required Consenting Creditors) or Reorganized Debtors, as applicable, have consented or (b) on or before the Effective Date, (i) this Court has entered a Final Order granting a motion filed by such holder requesting the authority to perform such setoff or recoupment or (ii) such holder has actually performed such recoupment and provided prior notice thereof, in each case, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff or recoupment. Notwithstanding any contrary language in this Order or the Plan, Eastern Gas Transmission and Storage, Inc. ("EGTS") shall retain any set off and recoupment rights, claims, and remedies alleged in its *Motion for Entry of an Order Lifting the Automatic Stay to Permit Setoff as an Alternative to Recoupment of Certain Funds Owed to the Debtor, Pursuant to 11 U.S.C. §§ 362, 506, and 553* [Doc. No. 407] (the "Lift Stay Motion"), subject to the Debtors' defenses, rights and claims against EGTS, pending the entry of Final Orders on the Lift Stay Motion and the related adversary proceeding [AP. No. 23-03186] that fully adjudicate EGTS's and the Debtors' rights, claims, and defenses thereunder.

Signed: October 04, 2023

Christopher Lopez
United States Bankruptcy Judge

# EXHIBIT A

## The Plan

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HERITAGE POWER, LLC, *et al.*,[1] | ) | Case No. 23-90032 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF HERITAGE POWER, LLC, ET AL.**

Dated: September 30, 2023


Charles A. Beckham, Jr. (TX Bar No. 02016600)
Kelli S. Norfleet (TX Bar No. 24070678)
Arsalan Muhammad (TX Bar No. 24074771)
Kourtney Lyda (TX Bar No. 24013330)
David Trausch (TX Bar No. 24113513)
**HAYNES AND BOONE, LLP**
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
Email: charles.beckham@haynesboone.com
Email: kelli.norfleet@haynesboone.com
Email: arsalan.muhammad@haynesboone.com
Email: kourtney.lyda@haynesboone.com
Email: david.trausch@haynesboone.com

Kenric D. Kattner (TX Bar No. 11108400)
David L. Staab (TX Bar No. 24093194)
**HAYNES AND BOONE, LLP**
30 Rockefeller Plaza 26th Floor
New York, New York 10112
Telephone: (212) 659-7300
Facsimile: (212) 918-8989
Email: kenric.kattner@haynesboone.com
Email: david.staab@haynesboone.com

*Counsel for the Debtors*


[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Heritage Power, LLC (9775); Blossburg Power, LLC (3538); Brunot Island Power, LLC (8482); Gilbert Power, LLC (2872); Hamilton Power, LLC (6256); Heritage Power Intermediate Holdings, LLC (8767); Heritage Power Marketing, LLC (3891); Hunterstown Power, LLC (4065); Mountain Power, LLC (6709); New Castle Power, LLC (8606); Niles Power, LLC (6766); Orrtanna Power, LLC (8863); Portland Power, LLC (3465); Sayreville Power, LLC (6167); Shawnee Power, LLC (3714); Shawville Power, LLC (8264); Titus Power, LLC (6547); Tolna Power, LLC (8431), and Warren Generation, LLC (8699). The location of the Debtors' service address is: 1360 Post Oak Blvd., Suite 2000, Houston, TX 77056.

# TABLE OF CONTENTS


I. DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME .......... 1

A. Defined Terms .......... 1

B. Rules of Interpretation and Computation of Time .......... 21

1. Rules of Interpretation .......... 21

2. Computation of Time .......... 22

3. Reference to Monetary Figures .......... 22

4. Consent Rights .......... 22

II. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .......... 23

A. Unclassified Claims .......... 23

1. Administrative Expense Claims and Priority Tax Claims .......... 23

a. Treatment of Administrative Expense Claims and Priority Tax Claims .......... 23

b. Filing Administrative Expense Claims .......... 23

c. U.S. Trustee Fees .......... 24

d. Professional Fee Claims .......... 24

e. Professional Fee Reserve Account .......... 25

f. Professional Fee Reserve Amount .......... 25

g. Post-Effective Date Fees and Expenses .......... 25

2. Consenting Stakeholder Fees and Expenses .......... 25

3. Administrative Agent Fees and Expenses .......... 26

4. DIP Claims .......... 26

B. Classification of Claims and Interests .......... 26

C. Treatment of Claims and Interests .......... 27

1. Class 1 – Other Secured Claims .......... 27

2. Class 2 – Other Priority Claims .......... 27

3. Class 3 – First Lien Secured Claims .......... 28

4. Class 4 – Convenience Claims .......... 28

5. Class 5 – General Unsecured Claims .......... 29

6. Class 6 – Intercompany Claims .......... 29

7. Class 7 – Subordinated Claims .......... 30

8. Class 8 – Intercompany Interests .......... 30

9. Class 9 – Existing Equity Interests .......... 30

| | | | |
|---|---|---|---|
| | D. | Reservation of Rights Regarding Claims | 31 |
| | E. | Postpetition Interest on Claims | 31 |
| | F. | Subordinated Claims | 31 |
| III. | ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS | | 31 |
| | A. | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 31 |
| | B. | Elimination of Vacant Classes | 31 |
| IV. | MEANS OF IMPLEMENTATION | | 31 |
| | A. | Operations Between the Confirmation Date and Effective Date | 31 |
| | B. | Sources of Cash for Plan Distributions | 32 |
| | C. | Issuance of New Equity Interests | 32 |
| | D. | Exit Facility | 33 |
| | E. | Continued Corporate Existence | 35 |
| | F. | Disbursing Agent | 35 |
| | G. | New Board of Directors/Officers | 35 |
| | H. | Management Incentive Plan | 36 |
| | I. | Retained Causes of Action | 36 |
| | J. | Cancellation and Surrender of Notes, Instruments, Securities and Other Documentation | 37 |
| | K. | Release of Liens | 37 |
| | L. | Effectuating Documents; Further Transactions | 37 |
| | M. | Additional Implementing Transactions | 39 |
| | N. | Section 1146 Exemption from Certain Taxes and Fees | 39 |
| | O. | Registration Rights Agreement | 39 |
| | P. | Insurance Policies | 39 |
| | Q. | New Castle HRCO | 40 |
| | R. | L/C Facilities | 41 |
| | S. | Shawville Lease Documents | 42 |
| | T. | Litigation Trust | 42 |
| | U. | Transition Services Agreement; Employee Matters | 43 |
| | V. | New Revolving Loan Facility | 44 |
| V. | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 45 |
| | A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 45 |

B. Claims Based on Rejection of Executory Contracts and Unexpired Leases .........45
C. Cure Claims .........46
D. Reservation of Rights .........46
E. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases .........46
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements .........47
G. Contracts and Leases Entered Into After the Petition Date .........47
VI. PROVISIONS GOVERNING DISTRIBUTIONS .........47
A. Method of Distributions to Holders of Claims .........47
B. New Equity Interests Reserve .........48
C. Undeliverable Distributions and Time Bar to Cash Payments .........48
D. Distribution Record Date .........49
E. Minimum Distributions .........49
F. Fractional Payments and Distributions .........49
G. No Fractional Shares .........49
H. Compliance with Tax Requirements .........49
I. Setoffs and Recoupment .........50
J. Allocation Between Principal and Accrued Interest .........50
K. Claims Paid or Payable by Third Parties .........51
1. Claims Paid by Third Parties .........51
2. Claims Payable by Insurance .........51
L. No Interest on Disputed or Delayed Distributions .........51
M. L/C Reserve .........52
N. Revolving L/C Reserve .........52
VII. CLAIMS ADMINISTRATION PROCEDURES .........53
A. Allowance of Claims .........53
B. Prosecution of Objections to Claims .........53
1. Authority to Prosecute and Settle Objections to Claims .........53
2. Objections to Claims .........53
3. Authority to Amend Schedules .........54
C. Estimation of Claims .........54
D. Claims Subject to Pending Actions .........54

|  |  |  |  |
|---|---|---|---|
| | E. | Distributions to Holders of Disputed Claims | 55 |
| | F. | Amendments to Proofs of Claim | 55 |
| VIII. | CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN | | 55 |
| | A. | Conditions to the Effective Date | 55 |
| | B. | Waiver of Conditions to the Effective Date | 56 |
| IX. | WITHDRAWAL AND MODIFICATION OF THE PLAN | | 56 |
| | A. | Withdrawal of the Plan | 56 |
| | B. | Modification of the Plan | 57 |
| X. | EFFECT OF CONFIRMATION | | 57 |
| | A. | Binding Effect | 57 |
| | B. | Vesting of Assets | 57 |
| | C. | Discharge of Claims Against and Interests in the Debtors | 57 |
| | D. | Exculpation | 58 |
| | E. | Releases | 58 |
| | | 1. Releases by the Debtors | 58 |
| | | 2. Releases by Holders of Claims and Interests | 61 |
| | F. | Injunction | 63 |
| | G. | Term of Injunctions or Stays | 64 |
| | H. | Ipso Facto and Similar Provisions Ineffective | 64 |
| | I. | Compromise and Settlement of Claims and Controversies | 64 |
| | J. | Protections Against Discriminatory Treatment | 64 |
| | K. | PJM Settlement | 65 |
| XI. | RETENTION OF JURISDICTION | | 65 |
| XII. | MISCELLANEOUS PROVISIONS | | 67 |
| | A. | Dissolution of Creditors' Committee | 67 |
| | B. | Inconsistency | 67 |
| | C. | Exhibits / Schedules | 67 |
| | D. | Severability | 68 |
| | E. | Governing Law | 68 |
| | F. | Entire Agreement | 68 |
| | G. | Expedited Tax Determination | 68 |
| | H. | Successors and Assigns | 69 |
| | I. | Service of Documents | 69 |

1. Debtors ........ 69

2. Ad Hoc Committee ........ 69

3. GenOn or Financial Sponsor ........ 69

4. Administrative Agent ........ 70

5. U.S. Trustee ........ 70

J. Post-Effective Date Service ........ 70

XIII. CONFIRMATION REQUEST ........ 71

# INTRODUCTION

Heritage Power, LLC, Blossburg Power, LLC, Brunot Island Power, LLC, Gilbert Power, LLC, Hamilton Power, LLC, Heritage Power Intermediate Holdings, LLC, Heritage Power Marketing, LLC, Hunterstown Power, LLC, Mountain Power, LLC, New Castle Power, LLC, Niles Power, LLC, Orrtanna Power, LLC, Portland Power, LLC, Sayreville Power, LLC, Shawnee Power, LLC, Shawville Power, LLC, Titus Power, LLC, Tolna Power, LLC, and Warren Generation, LLC propose this joint chapter 11 plan pursuant to section 1129 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. The Plan constitutes a separate Plan for each Debtor and does not effectuate a substantive consolidation of the Debtors or their Estates.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE DISCLOSURE STATEMENT ACCOMPANYING THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, THE RESTRUCTURING SUPPORT AGREEMENT, AND THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## I. DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

### A. Defined Terms

Capitalized terms used in the Plan and not otherwise defined herein have the meanings set forth in this Article I.A. of the Plan. Any term that is not defined in the Plan, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1. **"Ad Hoc Committee"** means that certain *ad hoc* committee of holders of Term Loan Claims represented by Milbank LLP and Porter Hedges LLP, as counsel, and Ducera Partners LLC, as financial advisor.

2. **"Administrative Agent"** means Jefferies Finance LLC in its capacity as administrative agent under the Credit Agreement, or any successor or replacement agent appointed pursuant to the terms thereof.

3. **"Administrative Agent Fees and Expenses"** means, collectively but solely to the extent required to be paid by the Debtors under the Credit Agreement, all accrued reasonable and documented fees and expenses incurred after the commencement of the Chapter 11 Cases and prior to the Effective Date related to any Debtors or their capital structure, the Restructuring Transactions, the Definitive Documents, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, in each case, of: (i) the Administrative Agent, and (ii) Latham & Watkins LLP, as counsel to the Administrative Agent.

4. **"Administrative Expense Claim"** means any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual, necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Debtors' Estates, (ii) DIP Claims (if any), (iii) the Consenting Stakeholder Fees and Expenses to the extent not previously paid for any reason, (iv) the Backstop Consideration payable to the Backstop Parties in accordance with the Exit Facility Documents, and (v) the Administrative Agent Fees and Expenses to the extent not previously paid for any reason.

5. **"Administrative Expense Claims Bar Date"** means the deadline for filing requests for payment of Administrative Expense Claims (other than Professional Fee Claims and DIP Claims, if any), which shall be the first Business Day that is thirty (30) days after the Effective Date.

6. **"Affiliate"** means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

7. **"Agent Expenses"** means fees, costs and expenses incurred by any Agent on or before the Effective Date to the extent payable or reimbursable under any Loan Document.

8. **"Agents"** means collectively, the Administrative Agent, the Collateral Agent, the Depositary Agent and each other Entity named as an agent under the Loan Documents, as the context may require.

9. **"Allowed"** means, with reference to any Claim, except as otherwise provided in the Plan, a Claim allowable under Bankruptcy Code section 502: (a) for which a Proof of Claim was timely filed, and as to which no objection or other challenge to allowance thereof has been filed, or if an objection or challenge has been timely filed, such Claim is allowed by Final Order; (b) for which a Proof of Claim is not filed and that has been listed in a Debtor's Schedules and is not listed as disputed, contingent, or unliquidated or in a zero or undetermined amount; or (c) that is deemed allowed under the Plan. For purposes of determining the amount of an Allowed Claim against a Debtor, there shall be deducted therefrom the amount of any claim (x) that such Debtor may hold against the holder of such Allowed Claim pursuant to any right of setoff held by such Debtor and (ii) held by any Debtor to the extent the doctrine of recoupment is applicable.

10. **"Avoidance Actions"** means any and all actual or potential avoidance, recovery, subordination, or other Claims, causes of action, or remedies that may be brought by or on behalf of the Debtors, their Estates, or other parties in interest with requisite standing under sections 502, 510, 542, 544, 545, 547 through 553, or 724(a) or other applicable sections of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer laws.

11. **"Backstop Commitment Letter"** means a commitment letter setting forth the terms and conditions under which the Backstop Parties have committed to backstop the funding of the Exit Facility.

12. **"Backstop Consideration"** means any cash or property (including New Equity Interests) payable to the Backstop Parties under the Backstop Commitment Letter as consideration for backstopping the funding of the Exit Facility, which, to the extent consisting of New Equity Interests, shall be subject to dilution on account of any New Equity Interests issued under any Management Incentive Plan.

13. **"Backstop Parties"** means the financial institutions and other Entities that commit to backstop the funding of the Exit Facility under the Backstop Commitment Letter.

14. **"Ballot"** means the applicable form of ballot distributed to holders of Claims entitled to vote on the Plan and on which the acceptance or rejection of the Plan is to be indicated.

15. **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

16. **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of Texas, Houston Division presiding over the Chapter 11 Cases.

17. **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

18. **"Bar Date"** means the deadlines for asserting Claims established by the Plan or the Bankruptcy Court, as applicable, including the Claims Bar Date, the Rejection Damages Deadline, and the Administrative Expense Claims Bar Date.

19. "**Bar Date Order"** means the *Order (i) Establishing Deadlines to File Proofs of Claim and (ii) Approving the Form and Manner of Notice Thereof* entered by the Bankruptcy Court at Docket No. 149 in the Chapter 11 Cases.

20. **"Business Day"** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close.

21. **"Cash"** means the lawful currency of the United States of America and equivalents thereof.

22. **"Cash Collateral Orders"** means the orders entered by the Bankruptcy Court at Docket No. 54 and Docket No. 118 in the Chapter 11 Cases.

23. **"Cause of Action"** means any action, Claim, cause of action, Avoidance Action, controversy, demand, right, action, Lien, indemnity, equity interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or

undisputed, Secured or Unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

24. **"Chapter 11 Cases"** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court.

25. **"Claim"** means a "claim," as such term is defined in section 101(5) of the Bankruptcy Code, against any Debtor.

26. **"Claims and Noticing Agent"** means Epiq Corporate Restructuring, LLC, in its capacity as claims, noticing, and solicitation agent appointed in the Chapter 11 Cases.

27. **"Claims Bar Date"** means, in accordance with the terms of the Bar Date Order: (a) with respect to all Claims other than those specified in sub-clauses (b) and (c) of this definition, 4:00 p.m. (Central Time) on April 21, 2023; (b) with respect to Claims held by Governmental Units (as defined in the Bar Date Order), 4:00 p.m. (Central Time) on July 24, 2023; and (c) with respect to Claims arising from the rejection of an Executory Contract or Unexpired Lease, the later of (i) 4:00 p.m. (Central Time) on April 21, 2023 (or 4:00 p.m. (Central Time) on July 24, 2023 for claims held by Governmental Units) or (ii) the Rejection Damages Deadline.

28. **"Claims Preservation Agreement"** means that certain Claims Preservation Agreement, dated as of January 24, 2023, by and among (i) certain GenOn entities, (ii) the Financial Sponsor, and (iii) the Consenting Creditors.

29. **"Class"** means a class of Claims or Interests, as set forth in Article II of the Plan.

30. "**Collateral Agent**" means MUFG Union Bank, N.A., as collateral agent under the Intercreditor Agreement, or any successor or replacement agent appointed pursuant to the terms thereof.

31. **"Confirmation"** means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

32. **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

33. **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

34. **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

35. **"Consenting Creditor"** means the beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold Loan Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement or have executed and delivered counterpart signature pages to a joinder to the Restructuring Support Agreement.

36. **"Consenting Creditor Preserved Claims"** means each "Preserved Claim" as defined in the Claims Preservation Agreement.

37. **"Consenting Stakeholder Fees and Expenses"** means, collectively, (x) all accrued reasonable and documented fees and expenses (whether incurred prior to or after the commencement of the Chapter 11 Cases and, with respect to the fees and expenses of Davis Polk & Wardwell LLP and PJT Partners LP, whether or not such fees and expenses have been paid by GenOn) related to any Debtors or their capital structure, the formulation, development, negotiation, documentation, or implementation of the Restructuring Support Agreement, the Restructuring Term Sheet attached as Exhibit B thereto, the Restructuring Transactions, the Definitive Documents, and/or any amendments, waivers, consents, supplements, or other modifications to any of the foregoing, in each case, of: (i)(a) Milbank LLP, Porter Hedges LLP, and Ross Aronstam & Moritz LLP, as counsel to the Ad Hoc Committee, and any regulatory counsel or other advisors retained by the Ad Hoc Committee, including any representative of the Ad Hoc Committee contemplated by the Transition Services Agreement, and (b) Ducera Partners LLC, as financial advisor to the Ad Hoc Committee, in accordance with that certain fee letter by and among Ducera Partners LLC and Heritage Power Intermediate Holdings, LLC, and (ii) solely with respect to reasonable and documented fees and expenses accrued prior to the Effective Date, (a) Davis Polk & Wardwell LLP, as counsel to GenOn, (b) PJT Partners LP, as financial advisor to GenOn, and (c) Quinn Emmanuel Urquhart & Sullivan, LLP, as local counsel to GenOn, in each case, in accordance with the engagement letters and/or fee letters, if applicable, among such counsel or professional and any of the Debtors or with GenOn (as applicable), including, without limitation, any success or transaction fees of financial advisors (but not legal advisors) contemplated therein; and (y) all reasonable and documented fees and expenses incurred by any regulatory counsel retained by any individual member of the Ad Hoc Committee.

38. **"Convenience Claim"** means all Allowed General Unsecured Claims of a single holder that are either (i) the Convenience Claim Threshold Amount or less in the aggregate or (ii)greater than the Convenience Claim Threshold Amount in the aggregate but as to which the holder thereof has elected to voluntarily reduce such Claims to the Convenience Claim Threshold Amount in the aggregate.

39. **"Convenience Claim Threshold Amount"** means $115,000 or such other higher amount determined by the Required Consenting Creditors, in their sole discretion, in consultation with the Debtors.

40. **"Credit Agreement"** means that certain Credit and Guaranty Agreement dated as of July 30, 2019, as amended, supplemented, or otherwise modified from time to time, among Heritage Power, LLC, as borrower, each of the other Debtors in their capacity as subsidiary guarantors, Heritage Power Intermediate Holdings, LLC, as pledgor, Jefferies Finance LLC, as Administrative Agent, MUFG Union Bank, N.A., as Collateral Agent, and the various financial institutions and lenders party from time to time thereto.

41. **"Creditors' Committee"** means the official committee of unsecured creditors, if any, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

42. **"Cure Claim"** means a Claim of a counterparty to an Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to sections 365 and/or 1123 of the Bankruptcy Code on account of monetary defaults under such Executory Contract or Unexpired Lease.

43. **"Debtors"** means, collectively, Heritage Power, LLC, Blossburg Power, LLC, Brunot Island Power, LLC, Gilbert Power, LLC, Hamilton Power, LLC, Heritage Power Intermediate Holdings, LLC, Heritage Power Marketing, LLC, Hunterstown Power, LLC, Mountain Power, LLC, New Castle Power, LLC, Niles Power, LLC, Orrtanna Power, LLC, Portland Power, LLC, Sayreville Power, LLC, Shawnee Power, LLC, Shawville Power, LLC, Titus Power, LLC, Tolna Power, LLC, and Warren Generation, LLC, as debtors in possession in the Chapter 11 Cases.

44. **"Definitive Documents"** means all of the definitive documents implementing the Restructuring Transaction, including (a) the Plan and all exhibits, ballots, solicitation procedures, and other documents and instruments related thereto; (b) the Plan Supplement; (c) the Confirmation Order; (d) the Disclosure Statement; (e) the Disclosure Statement Order; (f) all motions, filings, documents, and agreements related to the Plan, including the Disclosure Statement motion, any documentation relating to the solicitation of the Plan, and the brief in support of confirmation of the Plan; (g) the first-day pleadings filed with the Bankruptcy Court, the second-day pleadings filed with the Bankruptcy Court, all material pleadings, including the motion to reject the Dominion Agreement, and all bar date motions and claims estimation motions, and all orders sought pursuant to any of the foregoing; (h) the Cash Collateral Orders; (i) the Exit Facility Documents; (j) the New L/C Facility Documents; (k) the New Revolving Loan Facility Documents; (l) the New Castle HRCO Amendment; (m) the New Castle Contribution Agreement; (n) the Shawville Lease Documents Amendments; (o) the Replacement Operator Agreements; and (p) such other agreements and documentation reasonably desired or necessary to consummate and document the transactions contemplated by the Plan.

45. "**Depositary Agent**" means MUFG Union Bank, N.A., as depositary agent under the Intercreditor Agreement, or any successor or replacement agent appointed pursuant to the terms thereof.

46. **"DIP Claims"** means all Claims held by any agents, lenders, or other creditor parties under any DIP Facility.

47. **"DIP Facility"** means a debtor-in-possession financing facility, if any, obtained by any Debtor in the Chapter 11 Cases.

48. **"Disbursing Agent"** means an Entity appointed to make the distributions required by the Plan after the Effective Date, which may be the Reorganized Debtors.

49. **"Disclosure Statement"** means, collectively, the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Heritage Power, LLC, et al.* with respect to the Plan (including all exhibits and schedules thereto or referenced therein).

50. **"Disclosure Statement Order"** means an order of the Bankruptcy Court approving the Disclosure Statement.

51. **"Disputed Claim"** means any Claim or a portion of a Claim: (a) that is neither an Allowed Claim nor a disallowed Claim; (b) that is listed as disputed, contingent or unliquidated or in a zero or undetermined amount in the Schedules or that is otherwise subject to an objection; or (c) for which a Proof of Claim has been timely filed, but (i) the Debtors (or any other party in interest entitled to do so) have interposed a timely objection or request for estimation with respect thereto, which objection or request for estimation has not been withdrawn or determined by a Final Order or (ii) such Proof of Claim has been asserted in an amount that is greater than the undisputed, non-contingent or liquidated amount listed for such Claim in the Schedules.

52. **"Distribution"** means any distribution of property to a holder of an Allowed Claim on account of such Claim in accordance with Articles II and VI of the Plan.

53. **"Distribution Date"** means the Initial Distribution Date, any Periodic Distribution Dates, or the Final Distribution Date. Whenever the Plan provides that Distributions must be made on a particular Distribution Date it shall be deemed made on such Distribution Date if made as promptly thereafter as practicable.

54. **"Distribution Record Date"** means the date for determining which holders of Allowed Claims are eligible to receive Distributions hereunder, which, unless otherwise specified, shall be the Confirmation Date or such other date designated by the Debtors, subject to the prior written consent of the Required Consenting Creditors.

55. **"Dominion Agreement"** means that certain Service Agreement Applicable to Transportation of Natural Gas Under Rate Schedule FT, dated as of September 29, 2017, by and between Dominion Energy Transmission, Inc. and NRG REMA LLC (as predecessor to the applicable Debtor) (as may be amended, amended and restated, supplemented, or modified from time to time).

56. **"DTC"** means the Depository Trust Company.

57. **"Effective Date"** means the date upon which each of the conditions to the effectiveness of the Plan are satisfied or waived according to its terms.

58. **"Eligible Credit Support"** has the meaning ascribed to it in the New Castle HRCO.

59. **"Entity"** has the meaning set forth in section 101(15) of the Bankruptcy Code.

60. **"Estate"** means, as to each Debtor, the estate created for such Debtor pursuant to section 541 of the Bankruptcy Code.

61. **"Exchange Act"** means the Securities Act of 1934, 15 U.S.C. § 78a *et seq.*, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

62. **"Exculpated Parties"** means, to the maximum extent permitted by law, each Debtor in its capacity as such.

63. **"Executory Contract and/or Unexpired Lease"** means a contract or a lease to which a Debtor is a party or with respect to which a Debtor may be liable that is capable of being assumed, assumed and assigned or rejected under section 365 of the Bankruptcy Code, including any modifications, amendments, addenda or supplements thereto.

64. **"Existing Equity Interests"** means any Interests in the Parent.

65. **"Exit Facility"** means an exit financing facility to be entered into by the Reorganized Debtors on the Effective Date, with an available principal amount equal to (a) such amounts as determined by the Required Consenting Creditors to fund intended uses of proceeds, which may include, among other things: (i) if elected by the Required Consenting Creditors, funding the Litigation Trust, (ii) paying Consenting Stakeholder Fees and Expenses (other than those paid in connection with the GenOn Transition and Releases Fee), and (iii) working capital and general corporate purposes, plus (b) the GenOn Transition and Releases Fee.

66. **"Exit Facility Documents"** means all documentation effectuating the incurrence of the Exit Facility, including the Backstop Commitment Letter.

67. **"Exit Facility Lenders"** means, as of the Effective Date, the parties holdings loans or making commitments under the Exit Facility and any administrative agents or collateral agents under the Exit Facility.

68. **"Exit Facility Participation Consideration"** means, with respect to a holder of an Allowed First Lien Secured Claim, (i) such holder's entitlement under and in accordance with Article II of the Plan to elect to participate in funding its pro rata share of the Exit Facility Subscription Portion in accordance with the terms and conditions set forth in the Exit Facility Participation Procedures and the Exit Facility Documents, where "pro rata" means the ratio of (x) such holder's Allowed First Lien Secured Claims as of the record date set forth in the Exit Facility Participation Procedures to (y) the aggregate amount of all Allowed First Lien Secured Claims as of such record date; and (ii) its pro rata share of a percentage of the New Equity Interests as set forth in the Exit Facility Term Sheet (which percentage of New Equity Interests is subject to dilution by any New Equity Interests issued under any Management Incentive Plan), where "pro rata" means the ratio of (x) the principal amount of the Exit Facility Subscription Portion funded by such holder (including on account of any backstop commitment) to (y) the total principal amount of the Exit Facility Subscription Portion.

69. **"Exit Facility Participation Procedures"** means the Exit Facility Participation Procedures approved by the Bankruptcy Court pursuant to the Disclosure Statement Order.

70. **"Exit Facility Subscription Portion"** means two thirds (2/3) of the total principal amount of the Exit Facility.

71. **"Exit Facility Term Sheet"** means the term sheet annexed to the Disclosure Statement as Exhibit 3, as may be amended, which provides the terms and conditions of the Exit Facility.

72. **"Exit Facility Trust Funding"** shall have the meaning set forth in Article IV.T of the Plan.

73. **"Exit Term Loans"** means the term loans to be incurred under the Exit Facility.

74. **"FERC"** means the Federal Energy Regulatory Commission.

75. **"FERC 203 Application"** means an application submitted to FERC by the Debtors under Section 203 of the FPA.

76. **"Final Distribution Date"** means, for a particular Class of Claims, the Distribution Date upon which final Distributions to the holders thereof are to be made.

77. **"Final Order"** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

78. **"Financial Sponsor"** means the Affiliates of Strategic Value Partners, LLC party to the Restructuring Support Agreement, in their capacity as Consenting Creditors and/or holders of equity interests in GenOn Holdings, Inc. and Parent Sponsor (as applicable).

79. **"First Lien Claims"** means, collectively, the Term Loan Claims, the Revolving Loan Claims, the Shawville HRCO Obligations, and the L/C Reimbursement Claims.

80. **"First Lien Collateral Value"** means $364.4 million or such other amount as determined by the Bankruptcy Court.

81. **"First Lien Deficiency Claim"** means the portion of a First Lien Claim that is not Secured.

82. **"First Lien Distribution"** means (i) the New Equity Interests (subject to dilution by any New Equity Interests issued as Exit Facility Participation Consideration, as Backstop Consideration, or under any Management Incentive Plan) and (ii) the Exit Facility Participation Consideration.

83. **"First Lien Secured Claim"** means the portion of a First Lien Claim that is Secured.

*84.* **"FPA"** means the Federal Power Act, 16 U.S.C. §§ 791 *et seq.*, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder

85. **"General Unsecured Claim"** means any Claim, including First Lien Deficiency Claims, that is not an Administrative Expense Claim, Priority Tax Claim, DIP Claim, Other Secured Claim, Other Priority Claim, First Lien Secured Claim, Convenience Claim, Intercompany Claim, or a Claim that is Secured, subordinated, or entitled to priority under the Bankruptcy Code.

86. **"GenOn"** means GenOn Holdings, Inc., GenOn Energy Services, LLC and Parent Sponsor, together with Parent Sponsor's direct and indirect parent entities and other Affiliates (excluding the Debtors).

87. **"GenOn Exit Facility Payment"** means a Cash payment from the proceeds of the Exit Facility made to GenOn in the amount of the GenOn Transition and Releases Fee.

88. **"GenOn Participation"** means Parent Sponsor's participation interest in Macquarie's Project L/C Loan Commitment (as defined in the Credit Agreement) under the Credit Agreement in the amount of $10,000,000.

89. **"GenOn Transition and Releases Fee"** means an amount equal to the sum of (i) $25,000,000; plus (ii) Consenting Stakeholder Fees and Expenses incurred by GenOn; plus (iii) an amount equal to the New Castle Reimbursable Amounts; plus (iv) an amount equal to the L/C Reimbursement Payments arising prior to the Effective Date; minus (v) an amount equal to all Cash received by GenOn from the Debtors during or after the Chapter 11 Cases (excluding, for the avoidance of doubt, any Cash received by GenOn from the Debtors pursuant to the Transition Services Agreement or the Shawville Lease Documents) and that has been retained by GenOn and not avoided or in any way required to be disgorged or subject to any action seeking such avoidance or disgorgement.

90. **"GES"** means GenOn Energy Services LLC.

91. **"Governmental Unit"** shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

92. **"GUC Distribution"** means a Cash pool of $1 million or such other higher amount determined by the Required Consenting Creditors, in their sole discretion, in consultation with the Debtors.

93. **"Heritage Dedicated Employees"** shall have the meaning set forth in Section 1.01 of the Transition Services Agreement.

94. **"Impaired"** means "impaired" as such term is defined in section 1124 of the Bankruptcy Code.

95. **"Initial Distribution Date"** means the Effective Date or the date occurring as soon as reasonably practicable after the Effective Date when Distributions commence.

96. **"Intercompany Claim"** means any Claim held by a Debtor against another Debtor.

97. **"Intercompany Interest"** means any Interest held by a Debtor in another Debtor.

98. "**Intercreditor Agreement**" means that certain Collateral Agency and Intercreditor Agreement dated as of July 30, 2019 among Heritage Power, LLC, Heritage Power Intermediate Holdings, LLC, certain subsidiaries of Heritage Power, LLC, as Loan Parties, Jefferies Finance LLC, as Administrative Agent, MUFG Bank, N.A., as Collateral Agent and Depositary Agent, and each other person that becomes a Secured Party pursuant thereto, as amended, restated, supplemented or otherwise modified from time to time.

99. **"Interest"** means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including all ordinary shares, units, common stock, preferred stock, membership interests, partnership interests, or other instruments, evidencing any fixed or contingent ownership interest in such Debtor, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest, that existed immediately before the Effective Date.

100. **"L/C Reimbursement Claims"** means reimbursement or other Claims, if any, in respect of the letters of credit issued under the Credit Agreement, including all unpaid prepetition interest, fees, expenses, and other amounts owing under the Credit Agreement on account of such letters of credit (but excluding post-petition interest).

101. **"L/C Reimbursement Payments"** means, if GenOn is required to make any payment to Macquarie or any of its Affiliates or any other Person pursuant to the GenOn Participation on account of a drawing of a letter of credit occurring after the Petition Date, and if, and only if, such payment is the result of a letter of credit being drawn due to the maturity of the Project L/C Loans (as defined in the Credit Agreement) or the delivery of a notice of non-renewal by the applicable Project L/C Issuer (as defined in the Credit Agreement), the reimbursement by the Debtors or the Reorganized Debtors to GenOn for such payment as set forth herein and in the Restructuring Support Agreement.

102. **"L/C Reserve"** means a reserve to be established by the Disbursing Agent to hold the L/C Reserve Distribution pursuant to Article VI.M of the Plan.

103. **"L/C Reserve Distribution"** means the First Lien Distribution that would have been received on the Effective Date pursuant to the Plan by Project L/C Issuer (as defined in the Credit Agreement) of Project L/Cs that remain outstanding and undrawn on the Effective Date if such Project L/Cs (i) had in fact been drawn as of the Effective Date and (ii) such Project L/C Issuer held Allowed L/C Reimbursement Claims with respect to such Project L/Cs as of the Effective Date.

104. **"Liabilities"** means, as to any Person, all debts, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or unliquidated, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

105. **"Lien"** means "lien" as defined in section 101(37) of the Bankruptcy Code.

106. **"Litigation Trust"** means, if elected by the Required Consenting Creditors in their sole discretion, a litigation trust created prior to or on the Effective Date solely for the benefit of the holders of Litigation Trust Interests to receive an assignment from the Administrative Agent of the Consenting Creditor Preserved Claims.

107. **"Litigation Trust Agreement"** means the litigation trust agreement in form and substance acceptable to the Required Consenting Creditors and consistent with the Claims Preservation Agreement, as such litigation trust agreement is amended, supplemented, restated, or otherwise modified from time to time in accordance with its terms, that, among other things, establishes the Litigation Trust and describes the powers, duties, and responsibilities of the trustee thereunder.

108. **"Litigation Trust Interests"** means the interests in the Litigation Trust to be issued in accordance with this Plan.

109. **"Loan Claims"** means any Claim against any Debtor arising under, derived from, or based on the Credit Agreement.

110. **"Loan Documents"** has the meaning ascribed to such term in the Credit Agreement.

111. **"Macquarie"** means Macquarie Bank Limited.

112. **"Management Incentive Plan"** means a management incentive plan that may be implemented by the New Board following the Effective Date pursuant to which equity-based awards may be made to employees, directors, or other related parties of the Reorganized Debtors, which awards, to the extent consisting of New Equity Interests, shall not be subject to dilution on account of any New Equity Interests issued as First Lien Distributions, Exit Facility Participation Consideration, or Backstop Consideration.

113. **"Management Services Agreement"** means that certain Management Services Agreement dated as of July 30, 2019 among Heritage Power, LLC, GenOn Energy Services, LLC and the Parent Sponsor, as amended, restated, supplemented or otherwise modified from time to time.

114. **"New Board"** means the new board of directors of the Reorganized Parent.

115. **"New Castle Contribution Agreement"** means an agreement between the Parent Sponsor and Heritage Power Marketing, LLC (or its successor as party to the New Castle HRCO) and any other applicable Debtors that (i) requires that Heritage Power Marketing, LLC, such successor, or any other Debtor provide all required Eligible Credit Support or other cash, collateral, or other credit support required by Tenaska pursuant to the New Castle HRCO; (ii) if Tenaska consents (to the extent Tenaska's consent is required), allows for the return to GenOn of all Eligible Credit Support provided by GenOn and any other cash, collateral or other credit support provided by GenOn with respect to the New Castle HRCO (and replaces such credit support as set forth in clause (i)); and (iii) provides that the Reorganized Debtors shall grant a reimbursement right with

respect to any amount paid by GenOn to Tenaska, its Affiliates or any other person under the New Castle HRCO after the Effective Date (including on account of any of GenOn's Eligible Credit Support or other cash, collateral, or other credit support provided by GenOn pursuant to the New Castle HRCO that is liquidated in favor of Tenaska following the Effective Date), which right shall be supported by a lien that is *pari passu* with the liens securing the Exit Facility on the same collateral and subject to an intercreditor agreement which, if applicable, shall be executed on the Effective Date.

116. **"New Castle HRCO"** means that certain 2002 ISDA Master Agreement, dated as of May 23, 2018, between Tenaska Power Services Co. and Heritage Power Marketing, LLC (including the Schedule and Credit Support Annex thereto and each Transaction and Confirmation (including the New Castle HRCO Confirmation) entered into thereunder from time to time (in each case (other than New Castle HRCO Confirmation) as defined in the 2002 ISDA Master Agreement)), as amended, restated, supplemented or otherwise modified from time to time.

117. **"New Castle HRCO Amendment"** means an amendment to the New Castle HRCO that (i)(A) removes GenOn as a party to the New Castle HRCO and the Transaction (as defined in the New Castle HRCO) set forth therein, (B) removes GenOn as a Credit Support Provider (as defined in the New Castle HRCO) under the New Castle HRCO, and (C) otherwise relieves GenOn of all obligations under the New Castle HRCO and (ii) requires Tenaska to return to GenOn all Eligible Credit Support provided by GenOn and any other cash, collateral or other credit support provided by GenOn with respect to the New Castle HRCO.

118. **"New Castle Reimbursable Amounts"** means, if the New Castle HRCO is accelerated, terminated, or liquidated by Tenaska after the Petition Date but prior to the Effective Date, the amount of any payments by GenOn to Tenaska, its Affiliates or any other person pursuant to the New Castle HRCO on account of such acceleration, termination, or liquidation (which amount shall include any collateral or other credit support provided by GenOn in support of the obligations under the New Castle HRCO that is applied to pay any obligation to Tenaska), which amount will be reimbursed to GenOn as set forth herein.

119. **"New Equity Interests"** means equity interests in Reorganized Parent.

120. **"New Equity Interests Reserve"** means a reserve to be established by the Disbursing Agent to hold Reserved Interests pursuant to Article VI.B of the Plan.

121. **"New L/C Facility"** means, at the election of the Required Consenting Creditors, a new letter of credit facility that does not include any GenOn participation or credit support and that refinances or replaces the Project Letters of Credit or the Revolving Letters of Credit (as defined in the Credit Agreement).

122. **"New L/C Facility Documents"** means all documentation effectuating the incurrence of the New L/C Facility.

123. **"New Organizational Documents"** means the form of the amended certificates or articles of incorporation, bylaws, or such other applicable formation or governance documents of the Reorganized Debtors, including charters, a shareholder rights agreement, operating agreements, or other organization or formation documents, and documents reflecting board

designation rights, protective provisions, transfer rights and restrictions, registration rights, preemptive rights, information rights, and any other corporate governance for the Reorganized Debtors.

124. **"New Revolving Loan Facility"** means, at the election of the Required Consenting Creditors, a new revolving or working capital loan facility.

125. **"New Revolving Loan Facility Documents"** means all documentation effectuating the incurrence of the New Revolving Loan Facility.

126. **"O&M Agreement"** means that certain Operation and Maintenance Agreement dated as of July 30, 2019 among Heritage Power, LLC and GenOn Energy Services, LLC, as amended, restated, supplemented or otherwise modified from time to time.

127. **"Ordinary Course Professionals Fee Order"** means the *Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* entered by the Bankruptcy Court at Docket No. 205 in the Chapter 11 Cases.

128. **"Other Priority Claim"** means any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

129. **"Other Secured Claim"** means a Secured Claim other than a Priority Tax Claim, a DIP Claim, or a First Lien Secured Claim.

130. **"Parent"** means Heritage Power Intermediate Holdings, LLC.

131. **"Parent Sponsor"** means GenOn Holdings, LLC.

132. **"Periodic Distribution Date"** means, unless otherwise ordered by the Bankruptcy Court, (a) the first Business Day that is 180 days after the Initial Distribution Date and (b) thereafter, the first Business Day that is 180 days after the immediately preceding Periodic Distribution Date.

133. **"Person"** means an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Unit, or any other Entity.

134. **"Petition Date"** means January 24, 2023.

135. **"PJM"** means PJM Interconnection L.L.C.

136. **"PJM Penalty"** means any alleged "Non-Performance Charge," as such term is defined in the PJM Tariff, or any equivalent or successor term, or any other alleged penalty assessed by PJM against one or more of the Debtors pursuant to the PJM Tariff, that certain Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. entered into among PJM and one or more of the Debtors, or any related agreements, which has accrued prior to the Petition Date.

137. **"PJM Tariff"** means the PJM Open Access Transmission Tariff, as amended, amended and restated, supplemented, or modified from time to time.

138. **"Plan"** means this *Joint Chapter 11 Plan of Reorganization of Heritage Power, LLC, et al.* and all exhibits, appendices, and schedules thereto, including all documents and instruments contained in the Plan Supplement, as each may be amended, modified or supplemented in accordance with the terms set forth herein.

139. **"Plan Supplement"** means the compilation of certain documents and forms of documents, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms of the Plan and the Restructuring Support Agreement and in accordance with the Bankruptcy Code and the Bankruptcy Rules) that will be filed, in one or more filings, by the Debtors with the Bankruptcy Court five days prior to the Voting Deadline, including the following, as applicable: (a) Exit Facility Documents or the Exit Facility Term Sheet, (b) Retained Causes of Action Schedule, (c) Rejection Schedule, and (d) the identity and affiliations of the Persons proposed to serve on the New Board to the extent known.

140. **"Prepetition Revolving L/C Issuer"** means an entity designated as a "Revolving L/C Issuer" under the Credit Agreement.

141. **"Priority Tax Claim"** means any Secured Claim or Unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

142. **"Pro Rata"** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

143. **"Professional"** means a Person or Entity: (i) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to section 327, 328, 329, 330 or 331 of the Bankruptcy Code, or (ii) for which compensation and reimbursement has been awarded by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

144. **"Professional Fee Claim"** means any Claim of a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

145. **"Professional Fee Reserve Account"** means an account to be funded by the Debtors on or prior to the Effective Date in an amount equal to the Professional Fee Reserve Amount.

146. **"Professional Fee Reserve Amount"** means the estimate, as determined in accordance with Article II.A.1.f of the Plan, of the aggregate amount of unpaid Professional Fee Claims for all Professionals incurred through the Effective Date.

147. **"Proof of Claim"** means a proof of Claim filed with the Bankruptcy Court or the Claims and Noticing Agent in accordance with the applicable order of the Bankruptcy Court.

148. **"Registration Rights Agreement"** means an agreement relating to the registering, offering, and selling of the New Equity Interests, which agreement shall be in form and substance acceptable to the Required Consenting Creditors.

149. **"Reinstated"** means, with respect to a Claim, that such Claim is accorded treatment provided in section 1124(1) of the Bankruptcy Code.

150. **"Rejection Damages Deadline"** means the deadline by which a Proof of Claim on account of damages resulting from rejection of an Executory Contract or Unexpired Lease must be filed, which shall be the date specified by an order of the Bankruptcy Court or 30 days after entry of an order by the Bankruptcy Court authorizing the Debtors' rejection of the applicable Executory Contract or Unexpired Lease if not otherwise specified.

151. **"Rejection Schedule"** means a list of Executory Contracts and Unexpired Leases that shall be rejected pursuant to the Plan, which list shall be filed as part of the Plan Supplement and may be amended from time to time in accordance with this Plan and the Restructuring Support Agreement.

152. **"Related Parties"** means, with respect to an Entity, each of, and in each case in its capacity as such, such Entity's current and former Affiliates, and such Entity's and such Affiliates' current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds (including any beneficial holders for the account of whom such funds are managed), predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such person's or Entity's respective heirs, executors, estates, and nominees.

153. **"Released Parties"** means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Agent; (d) each of the Consenting Creditors; (e) each holder of a First Lien Claim; (f) GenOn; (g) Financial Sponsor; (h) each Backstop Party; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j); provided that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in the Plan that is not resolved before the confirmation of the Plan.

154. **"Releasing Parties"** means, collectively, and in each case in its capacity as such, (a) each Debtor; (b) each Reorganized Debtor; (c) each Agent; (d) each of the Consenting Creditors; (e) each holder of a First Lien Claim; (f) GenOn; (g) Financial Sponsor; (h) each holder

of a Claim or Interest (1) that votes to accept the Plan, (2) whose vote to accept or reject the Plan is solicited but that does not vote either to accept or to reject the Plan and does not timely elect to opt out of granting the releases set forth herein, (3) that votes, or is deemed, to reject the Plan but does not timely elect to opt out of granting the releases set forth herein, or (4) whose vote to accept or reject the Plan is not solicited and that does not timely elect to opt out of granting the releases set forth herein; (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j); and (j) each Related Party of each Entity in clause (a) through this clause (j); provided that in each case, an Entity shall not be a Releasing Party if it: (x) timely elects to opt out of granting the releases contained in the Plan, including through any Ballot or notice of non-voting status; or (y) timely files with the Bankruptcy Court an objection to the releases contained herein that is not resolved before the confirmation of the Plan.

155. **"Reorganized Debtors"** means the Debtors as reorganized on the Effective Date in accordance with the Plan.

156. **"Reorganized Parent"** means, as determined by the Required Consenting Creditors, either (a) Parent as reorganized on the Effective Date in accordance with the Plan or (b) a new corporation, limited liability company, or partnership that may be formed to, among other things, directly or indirectly acquire all or substantially all of the assets and/or stock of the Debtors and issue the New Equity Interests to be distributed pursuant to the Plan.

157. **"Replacement Operator Agreements"** means (i) the agreement to be entered into among Middle River Power or one or more of its affiliates and one or more of the Debtors or Reorganized Debtors, as applicable, pursuant to which Middle River Power or one or more of its affiliates will provide asset management services to the Debtors or Reorganized Debtors, as applicable, (ii) the agreement to be entered into among NAES Corporation or one or more of its affiliates and one or more of the Debtors or Reorganized Debtors, as applicable, pursuant to which NAES Corporation or one or more of its affiliates will provide operations and maintenance services to the Debtors or Reorganized Debtors, as applicable, and (iii) any documents ancillary to the agreements described in each of clauses (i) and (ii) of this definition.

158. **"Representatives"** means, with respect to any Person or Entity, solely in their respective capacities as such, (a) such Person's or Entity's successors, predecessors, Affiliates, current and former officers, directors, employees, partners, limited partners, general partners, principals, managers, members, management companies, advisory board members, investment managers, employees, equity holders (regardless of whether interests are held directly or indirectly), agents, attorneys, investment bankers, financial advisors, accountants or other professionals, and (b) such Person's or Entity's Affiliates' current and former directors, managers, officers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, and other professionals.

159. **"Required Consenting Creditors"** means, as of the relevant date, those Consenting Creditors holding greater than 66.67% of the aggregate outstanding principal amount of the Term Loan Claims that are held by all Consenting Creditors in the aggregate (in each case, excluding the Financial Sponsor).

160. **"Reserve Holder"** means, with respect to any Reserved Interests, the holder of an Allowed Claim that would have received a distribution of such Reserved Interests pursuant to the Plan but for Article VI.B of the Plan.

161. **"Reserved Interests"** means New Equity Interests that: (i) would be distributable to a holder of an Allowed Claim on account of such Claim pursuant to Articles II and VI.A of the Plan if no effect were given to Article VI.B of the Plan and (ii) would, if received by such holder, result in such holder, together with its "affiliates" as defined in 18 C.F.R. § 35.36(a)(9) or other applicable FERC regulation, having the power to exercise the voting rights of New Equity Interests in excess of 9.99% of the total amount of issued and outstanding New Equity Interests (including all New Equity Interests held in the New Equity Interests Reserve).

162. **"Restructuring Support Agreement"** means that certain Restructuring Support Agreement among the Debtors and the other signatories thereto, dated as of January 24, 2023, together with all schedules, annexes and exhibits attached thereto (including the Restructuring Term Sheet attached as Exhibit B thereto), as amended, supplemented, or otherwise modified from time to time.

163. **"Restructuring Transaction Steps"** means the series of corporate transactions and actions to be implemented on or around the Effective Date pursuant to the Plan and filed as part of the Plan Supplement.

164. **"Restructuring Transactions"** means all transactions described in, approved by, contemplated by, or undertaken to implement (including through the Plan Supplement) the Plan.

165. **"Retained Causes of Action"** means all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities, arising on, prior to or after the Petition Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising in law, equity or otherwise, including Avoidance Actions, asserted, or which may be asserted, by or on behalf of any of the Debtors or the Estates, based in law or equity, including, without limitation, whether asserted or unasserted as of the Effective Date, that are retained by the Reorganized Debtors; which, for the avoidance of doubt, shall not include any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities against any Released Party.

166. **"Retained Causes of Action Schedule"** means the schedule listing all Retained Causes of Action to be included in the Plan Supplement.

167. **"Revolving L/C Reserve"** means a reserve to be established by the Disbursing Agent to hold the Revolving L/C Reserve Distribution pursuant to Article VI.N of the Plan.

168. **"Revolving L/C Reserve Distribution"** means the First Lien Distribution that would have been received on the Effective Date pursuant to the Plan by a Prepetition Revolving L/C Issuer of Revolving Letters of Credit that remain outstanding and undrawn on the Effective Date if such Revolving Letters of Credit (i) had in fact been drawn as of the Effective Date and (ii) such Prepetition Revolving L/C Issuer held Allowed L/C Reimbursement Claims with respect to such Revolving Letters of Credit as of the Effective Date.

169. **"Revolving Letter of Credit"** shall have the meaning set forth in the Credit Agreement.

170. **"Revolving Loan Claims"** means all Claims arising from the revolving loans drawn under the Credit Agreement.

171. **"Revolving Loan Claims Amount"** means an amount as of the Effective Date equal to (i) no less than $32,270,394.71 representing total principal outstanding *plus* (ii) all unpaid prepetition interest, fees, expenses, and other amounts owing under the Credit Agreement on account of the revolving loans drawn thereunder (excluding any post-petition interest).

172. **"Schedules"** means, collectively, the (a) schedules of assets and liabilities and (b) statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as each may be amended and supplemented from time to time.

173. **"SEC"** means the U.S. Securities and Exchange Commission.

174. **"Section 510(b) Claim"** means any option, warrant, right, or other security or agreement to obtain an Interest, whether or not arising under or in connection with any employment agreement, subject to subordination pursuant to section 510(b) of the Bankruptcy Code.

175. **"Secured"** means, with respect to a Claim, a Claim (i) secured by a Lien to the extent of the value of the interest of the holder of such Lien in the Estate's interest in the applicable collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the right of setoff in accordance with section 553 of the Bankruptcy Code.

176. **"Securities Act"** means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

177. **"Security"** means a "security" as defined in section 2(a)(1) of the Securities Act.

178. **"Shawville Facility Lease"** means the Facility Lease Agreement, dated as of August 24, 2000, between Shawville Lessor GenCo LLC, as Owner Lessor, and Reliant Energy Mid-Atlantic Power Holdings, LLC (as predecessor to Shawville Power, LLC), as Facility Lessee, as amended, amended and restated, supplemented, or modified from time to time.

179. **"Shawville HRCO"** means the 2002 ISDA Master Agreement dated as of July 27, 2021 between J. Aron & Company LLC and Heritage Power Marketing, LLC (including the Schedule and Credit Support Annex thereto and each Transaction and Confirmation entered into thereunder from time to time (in each case as defined in the 2002 ISDA Master Agreement)), as amended, restated, supplemented or otherwise modified from time to time.

180. **"Shawville HRCO Obligations"** means Claims arising under the Shawville HRCO, including all unpaid prepetition interest, fees, expenses, and other amounts owing thereunder on account of such obligations (excluding any post-petition interest).

181. **"Shawville Lease Documents"** means the Shawville Leases, the Shawville Participation Agreement, and each other document or agreement described in the definition of "Operative Documents" in the Shawville Participation Agreement, in each case as amended, restated, supplemented or otherwise modified from time to time.

182. **"Shawville Lease Documents Amendments"** means amendments to the Shawville Lease Documents that will have the effect of permitting thereunder (to the extent not already permitted): the incurrence of debt and the granting of liens in connection with each of (i) the Exit Facility, (ii) the New L/C Facility, (iii) the New Revolving Loan Facility, (iv) any hedging-related obligations, and (v) any refinancing or replacement of any of the facilities or other obligations identified in (i)-(iv) of this definition and which amendments shall be in form and substance reasonably acceptable to GenOn, the Debtors, and the Required Consenting Creditors.

183. **"Shawville Lease Documents Claims"** means any and all claims and causes of action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, that are held by or assertable on behalf of the Debtors, their Estates, or the Reorganized Debtors that any of the Debtors, their Estates, the Reorganized Debtors, and/or their respective successors, assigns and representatives would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Shawville Lease Documents, that are against GenOn, the Financial Sponsor, any current and former Affiliate of GenOn or the Financial Sponsor, or any Related Party of GenOn or the Financial Sponsor.

184. **"Shawville Leases"** means (i) the Shawville Facility Lease and (ii) that certain Site Lease and Sublease Agreement dated as of June 24, 2000 among Shawville Power, LLC, as Ground Lessor and Ground Sublesee, and Shawville Lessor Genco LLC, as Ground Lessee and Ground Sublessor.

185. **"Shawville Participation Agreement"** means that certain Participation Agreement dated as of August 24, 2000 among Shawville Lessor Genco LLC, as Owner Lessor, Shawville Power, LLC, as Facility Lessee, PSEGR Shawville Generation, LLC, as Owner Participant, and the other persons from time to time party thereto, as amended, restated, supplemented or otherwise modified from time to time.

186. **"Shawville Transaction"** means the transactions consummated or to be consummated pursuant to that certain Membership Interest Purchase and Sale Agreement dated as of December 2, 2022 among PSEGR PJM, LLC, as Seller, GenOn Energy Services, LLC, as Buyer, and the Parent Sponsor, as Buyer Guarantor, and all other related documents and agreements.

187. **"Sponsor EMA Reimbursement Agreement"** means that certain Sponsor EMA Reimbursement Agreement dated as of July 30, 2019 among Heritage Power Marketing, LLC and Parent Sponsor.

188. **"Sponsor Preserved Claims"** means each "Preserved Counterclaim" as defined in the Claims Preservation Agreement.

189. **"Subordinated Claim"** means a Claim that is subordinated under section 510 of the Bankruptcy Code, including all Section 510(b) Claims.

190. **"Tenaska"** means Tenaska Power Services Co.

191. **"Term Loan Claims"** means all Claims arising from the term loans incurred under the Credit Agreement.

192. **"Term Loan Claims Amount"** means an amount as of the Effective Date equal to (i) no less than $484,600,000 representing total principal outstanding *plus* (ii) all unpaid prepetition interest, fees, expenses, and other amounts owing under the Credit Agreement on account of the term loans incurred thereunder (excluding any post-petition interest).

193. **"Transition Services Agreement"** means that certain Transition Services Agreement, dated January 24, 2023, by and among certain GenOn entities and certain Debtors.

194. **"Unimpaired"** means, with respect to a Claim, Interest, or a Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

195. **"Unsecured"** means, with respect to a Claim, a Claim that is not a Secured Claim.

196. **"U.S. Trustee"** means the Office of the United States Trustee for Region 7.

197. **"U.S. Trustee Fees"** means all fees payable pursuant to 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717.

198. **"Voting Deadline"** means the deadline for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, which is 4:00 p.m. (prevailing Central Time) on September 25, 2023.

## B. Rules of Interpretation and Computation of Time

### 1. Rules of Interpretation

For the purposes of this Plan: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender, (ii) any reference herein to the word "including" or any word of similar import shall be read to mean "including without limitation," (iii) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto, (iv) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than a particular portion of the Plan, (v) captions and headings to Articles are inserted for the convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, (vi) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, (vii) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement, (viii) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case

Management/Electronic Case Files system, (ix) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated, (x) any reference herein to a contract, agreement, lease, plan, policy, document or instrument being in a particular form or on particular terms and conditions means that the same shall be substantially in that form or substantially on those terms and conditions, (xi) any reference herein to a contract, agreement, lease, plan, policy, document or instrument or schedule or exhibit thereto, whether or not filed, shall mean the same as amended, restated, modified or supplemented from time to time in accordance with the terms hereof or thereof, (xii) any effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order, but subject to the terms of the Restructuring Support Agreement (including the notice and consent rights thereunder), (xiii) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and permitted assigns, (xiv) references to "shareholders," "directors" and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company laws, and (xv) except as otherwise expressly provided in this Plan, where this Plan contemplates that any Debtor or Reorganized Debtor, as applicable, shall take any action, incur any obligation, issue any security or adopt, assume, execute or deliver any contract, agreement, lease, plan, policy, document or instrument on or prior to the Effective Date, the same shall be duly and validly authorized by the Plan and effective against and binding upon such Debtor or Reorganized Debtor, as applicable, on and after the Effective Date without further notice to, order of or other approval by the Bankruptcy Court, action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of the board of directors of any Debtor or any other Entity.

**2. Computation of Time**

In computing any period, date, or deadline prescribed or allowed in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply. If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act or the occurrence of such deadline shall instead be deemed to be required or occur on the next succeeding Business Day.

**3. Reference to Monetary Figures**

All references in the Plan to monetary figures refer to the lawful currency of the United States of America, unless otherwise expressly provided.

**4. Consent Rights**

Notwithstanding anything in the Plan to the contrary, prior to the Effective Date, (i) any and all consent rights of all parties to the Restructuring Support Agreement under such agreement with respect to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, the proposed form of the Confirmation Order, and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements or documents, and any consents, waivers, or other deviations under or from any such agreements or documents, as more fully set forth in the Restructuring Support Agreement, are incorporated herein by this

reference and shall be fully enforceable as if stated in full herein, and (ii) to the extent provided in the Restructuring Support Agreement, any action or inaction that may be taken by the Debtors hereunder shall require the consent of the parties to the Restructuring Support Agreement. Any settlement of any Claim or agreement by a holder of a Claim to accept less favorable treatment shall require the prior written consent of the Required Consenting Creditors. Notwithstanding anything in the Plan to the contrary, failure to reference herein any right, privilege or obligation provided for by the Restructuring Support Agreement shall not impair any such right, privilege or obligation. In the event of any inconsistency between this Article I.B.4 and any other provision of the Plan, this Article I.B.4 shall control.

## II. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The Plan constitutes a separate Plan proposed by each Debtor. All Claims and Interests, except for the Claims set forth in Article II.A, are classified for voting and Distribution purposes as set forth below in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.

### A. Unclassified Claims

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, Priority Tax Claims, fees payable pursuant to 28 U.S.C. § 1930, Professional Fee Claims, Consenting Stakeholder Fees and Expenses, Administrative Agent Fees and Expenses, and DIP Claims, if any, have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article II.B hereof.

#### 1. Administrative Expense Claims and Priority Tax Claims

##### a. Treatment of Administrative Expense Claims and Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim or an Allowed Administrative Expense Claim (other than an Allowed DIP Claim or an Allowed Professional Fee Claim) agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim or an Allowed Administrative Expense Claim (other than an Allowed DIP Claim or an Allowed Professional Fee Claim) shall receive, in full and final satisfaction of such Claim, at the election of the Debtors or Reorganized Debtors, as applicable, (a) Cash in an amount equal to such Allowed Claim, payable (i) with respect to the Administrative Expense Claims incurred in the ordinary course of business, at the election of the Debtors or Reorganized Debtors, as applicable, when required by the documentation or arrangement giving rise to such Claim or (ii) on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Claim becomes Allowed or, in each case, as soon as reasonably practicable thereafter, or (b) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

##### b. Filing Administrative Expense Claims

Absent order of the Bankruptcy Court to the contrary, all requests for payment of Administrative Expense Claims that accrued on or before the Effective Date (other than on account of Allowed DIP Claims, Professional Fee Claims, or U.S. Trustee Fees) must be filed with the Claims and Noticing Agent and served on counsel for the Debtors by the Administrative Expense

Claim Bar Date. Any holder of an Administrative Expense Claim who is required to, but does not, file on the docket and serve a request on counsel to the Debtors (if service is prior to the Effective Date) or counsel to the Reorganized Debtors (if service is on or after the Effective Date) for payment of such Administrative Expense Claim on or prior to the Administrative Expense Claim Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Expense Claim against the Debtors or the Reorganized Debtors or their respective property, and such Administrative Expense Claim shall be deemed discharged as of the Effective Date.

Following the Effective Date, the Reorganized Debtors, in their sole discretion, shall have exclusive authority to settle Administrative Expense Claims without further Bankruptcy Court approval.

Unless the Debtors or the Reorganized Debtors or any other Entity object to a timely filed and properly served Administrative Expense Claim payment request by 90 days from the Effective Date, subject to further extensions and/or exceptions as may be ordered by the Bankruptcy Court, such Administrative Expense Claim shall be deemed Allowed in the amount requested. If the Debtors or the Reorganized Debtors or any other Entity object to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

Notwithstanding the foregoing, requests for payment of Administrative Expense Claims need not be filed for Administrative Expense Claims that (i) are for goods or services provided to the Debtors in the ordinary course of business, (ii) previously have been Allowed by Final Order of the Bankruptcy Court, (iii) are on account of postpetition taxes (including any related penalties or interest) owed by the Debtors to any Governmental Unit, or (v) the Debtors or, after the Effective Date, the Reorganized Debtors, have otherwise agreed in writing do not require such a filing.

**c. U.S. Trustee Fees**

All fees payable pursuant to 28 U.S.C. § 1930 on or before the Effective Date, shall be paid in full on the Effective Date. Fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the Reorganized Debtors until the closing of the applicable case pursuant to section 350(a) of the Bankruptcy Code.

**d. Professional Fee Claims**

All final requests for payment of Professional Fee Claims shall be filed and served no later than 30 days after the Effective Date; provided however, ordinary course professionals shall be compensated in accordance with the Ordinary Course Professionals Fee Order. The Bankruptcy Court shall determine the Allowed amounts of all Professional Fee Claims. Any objections to any Professional Fee Claims must be filed and served on the Debtors and the requesting party no later than 30 days after service of the final request for payment of such Professional Fee Claims.

Except to the extent that the applicable holder of an Allowed Professional Fee Claim agrees to less favorable treatment with the Debtors or, after the Effective Date, the Reorganized Debtors, each holder of an Allowed Professional Fee Claim shall be paid in full in Cash.

**e. Professional Fee Reserve Account**

On or prior to the Effective Date, the Debtors shall fund the Professional Fee Reserve Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Reserve Account shall be maintained in trust for the Professionals. Such funds in the Professional Fee Reserve Account shall not constitute property of the Debtors' Estates, except as otherwise expressly set forth in the last sentence of this paragraph. The Allowed Professional Fee Claims shall be paid in Cash to such Professionals from the funds held in the Professional Fee Reserve Account, without interest or other earnings therefrom, within 3 business days after such Claims are Allowed by a Bankruptcy Court order; provided that the Debtors' obligation with respect to Professional Fee Claims will not be limited nor be deemed to be limited in any way to the balance of funds held in the Professional Fee Reserve Account. When all Allowed Professional Fee Claims have been paid in full, the Cash remaining in the Professional Fee Reserve Account, if any, shall revert to the Reorganized Debtors, without any further notice to, action, order, or approval of the Bankruptcy Court.

**f. Professional Fee Reserve Amount**

To receive payment for unbilled fees and expenses incurred through and including the Effective Date, the Professionals shall estimate their accrued Professional Fee Claims prior to and as of the Confirmation Date, along with an estimate of fees and expenses to be incurred through and including the Effective Date, and shall deliver such reasonable, good-faith estimates to the Debtors and counsel to the Ad Hoc Committee by no later than seven days before the Effective Date; provided, however, that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professional. If a Professional does not provide such estimate, the Debtors may estimate in good faith the unbilled fees and expenses of such Professional. The total amount so estimated shall comprise the Professional Fee Reserve Amount. To the extent the Professional Fee Reserve Amount is not sufficient to pay all Allowed Professional Fee Claims in full, the remaining aggregate amount of the Allowed Professional Fee Claims shall be paid by the Reorganized Debtors.

**g. Post-Effective Date Fees and Expenses**

From and after the Effective Date, the Reorganized Debtors may, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the legal, professional or other fees and expenses related to the implementation and consummation of the Plan incurred by the Reorganized Debtors or any professional following the Effective Date. Upon the Effective Date, any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

**2. Consenting Stakeholder Fees and Expenses**

Without the filing of any retention applications, fee applications, or any other applications

in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval, (i) on the Effective Date, the Reorganized Debtors shall pay in full in Cash any outstanding Consenting Stakeholder Fees and Expenses that are invoiced at least three (3) Business Days prior to the Effective Date and (ii) any Consenting Stakeholder Fees and Expenses invoiced thereafter shall be paid in accordance with the Restructuring Support Agreement as if no termination of the Restructuring Support Agreement has occurred.

**3. Administrative Agent Fees and Expenses**

Without the filing of any retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval, on the Effective Date, the Reorganized Debtors shall pay in full in Cash any outstanding Administrative Agent Fees and Expenses that are invoiced at least three (3) Business Days prior to the Effective Date.

**4. DIP Claims**

If the Debtors enter into a DIP Facility, treatment of the DIP Claims shall be as agreed among the Debtors and the Required Consenting Creditors in a manner consistent with the provisions of the Bankruptcy Code, any orders of the Bankruptcy Court approving and effectuating such DIP Facility and the Restructuring Support Agreement.

**B. Classification of Claims and Interests**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, all Claims and Interests, except for Claims addressed in Article II.A of the Plan, are classified for all purposes as set forth in this Article II.B. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that Class and is classified in another Class to the extent that another portion of such Claim or Interest fits within the description of such other Class. A Claim also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Except as otherwise specifically provided for in the Plan, the Confirmation Order or other order of the Bankruptcy Court, in no event shall any holder of an Allowed Claim be entitled to receive payments that in the aggregate exceed the Allowed amount of such Claim.

The following table (a) designates the Classes of Claims and Interests for the purposes of voting on the Plan and receiving Distributions hereunder and (b) specifies which Classes are (i) Impaired or Unimpaired by the Plan, and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Designation | Treatment | Voting Status |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |

| Class | Designation | Treatment | Voting Status |
|---|---|---|---|
| 3 | First Lien Secured Claims | Impaired | Entitled to Vote |
| 4 | Convenience Claims | Unimpaired | Presumed to Accept |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired | Presumed to Accept / Deemed to Reject |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Unimpaired | Presumed to Accept / Deemed to Reject |
| 9 | Existing Equity Interests | Impaired | Deemed to Reject |

## C. Treatment of Claims and Interests

### 1. Class 1 – Other Secured Claims

**a.** *Classification.* Class 1 consists of all Other Secured Claims.

**b.** *Treatment.* Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Claim, at the option of the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors, (i) each such holder shall receive payment in full in Cash of such Allowed Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter, (ii) such holder's Allowed Other Secured Claim shall be Reinstated, or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

**c.** *Voting.* Claims in Class 1 are Unimpaired. Each holder of an Allowed Claim in Class 1 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

### 2. Class 2 – Other Priority Claims

**a.** *Classification.* Class 2 consists of all Other Priority Claims.

**b.** *Treatment.* Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of

an Allowed Other Priority Claim shall, at the option of the Debtors (with the consent of the Required Consenting Creditors) or the Reorganized Debtors, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.

**c.** *Voting.* Claims in Class 2 are Unimpaired. Each holder of an Allowed Claim in Class 2 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

**3. Class 3 – First Lien Secured Claims**

**a.** *Classification.* Class 3 consists of all First Lien Secured Claims.

**b.** *Treatment.* Each holder of an Allowed First Lien Secured Claim shall receive, in full and final satisfaction of such Allowed First Lien Secured Claim, on the later of (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date on which such First Lien Secured Claim becomes Allowed, or as soon as reasonably practicable thereafter, its Pro Rata share of the First Lien Distribution.

**c.** *Voting.* Claims in Class 3 are Impaired. Each holder of a Claim in Class 3 is entitled to vote to accept or reject the Plan.

**d.** *Allowance*. The First Lien Secured Claims on account of the Term Loan Claims shall be deemed Allowed as of the Effective Date in an aggregate amount equal to (i) the First Lien Collateral Value *multiplied by* (ii) the ratio of the Term Loan Claims Amount to the aggregate amount of all Allowed First Lien Claims.

The First Lien Secured Claims on account of the Revolver Loan Claims shall be deemed Allowed as of the Effective Date in an aggregate amount equal to (i) the First Lien Collateral Value *multiplied by* (ii) the ratio of the Revolving Loan Claims Amount to the aggregate amount of all Allowed First Lien Claims.

**4. Class 4 – Convenience Claims**

**a.** *Classification*. Class 4 consists of all Convenience Claims.

**b.** *Treatment*. Each holder of an Allowed Convenience Claim shall be paid in the ordinary course of business (subject to all defenses and disputes the Debtors or the Reorganized Debtors may assert

as to the validity or amount of such Claims) or shall receive such other treatment as may be required to deem such Allowed Convenience Claim Unimpaired under the Bankruptcy Code.

**c.** *Voting*. Claims in Class 4 are Unimpaired. Each holder of a Claim in Class 4 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote to accept or reject the Plan.

**5. Class 5 – General Unsecured Claims**

**a.** *Classification*. Class 5 consists of all General Unsecured Claims.

**b.** *Treatment*. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the GUC Distribution, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, in each case, or as soon as reasonably practicable thereafter. For the avoidance of doubt, Class 5 includes the First Lien Deficiency Claims, and any Claim resulting from the rejection of the Dominion Agreement.

**c.** *Voting*. Claims in Class 5 are Impaired. Each holder of a Claim in Class 5 is entitled to vote to accept or reject the Plan.

**d.** *Allowance*. The First Lien Deficiency Claims on account of the Term Loan Claims shall be deemed Allowed as of the Effective Date in an aggregate amount equal to (i) the Term Loan Claims Amount *minus* (ii) the aggregate amount of Term Loan Claims that are Allowed as Secured Claims under Article II.C.3.d.

The First Lien Deficiency Claims on account of the Revolver Loan Claims shall be deemed Allowed as of the Effective Date in an aggregate amount equal to (i) the Revolving Loan Claims Amount *minus* (ii) the aggregate amount of Revolving Loan Claims that are Allowed as Secured Claims under Article II.C.3.d.

**6. Class 6 – Intercompany Claims**

**a.** *Classification.* Class 6 consists of all Intercompany Claims.

**b.** *Treatment.* On the Effective Date, all Intercompany Claims shall be adjusted, Reinstated, or cancelled, as determined by the Debtors with the consent of the Required Consenting Creditors.

**c.** *Voting.* Claims in Class 6 are either (i) Unimpaired and therefore

each holder of an Allowed Claim in Class 6 is conclusively presumed to have accepted the Plan or (ii) Impaired and not receiving any distribution under the Plan and therefore each holder of an Allowed Claim in Class 6 is conclusively deemed to have rejected the Plan. Therefore, in each case, each holder of an Allowed Claim in Class 6 is not entitled to vote on the Plan.

**7. Class 7 – Subordinated Claims**

**a.** *Classification.* Class 7 consists of all Subordinated Claims.

**b.** *Treatment.* On the Effective Date, all Subordinated Claims, if any, shall be canceled, released, extinguished, and discharged, and shall be of no further force or effect. Holders of Subordinated Claims shall receive no recovery or distribution on account of such Claims.

**c.** *Voting.* Class 7 is Impaired. Each holder of a Claim in Class 7 is conclusively deemed to have rejected the Plan and is, therefore, not entitled to vote on the Plan.

**8. Class 8 – Intercompany Interests**

**a.** *Classification.* Class 8 consists of all Intercompany Interests.

**b.** *Treatment.* On the Effective Date, all Intercompany Interests (which shall include all Interests other than the Existing Equity Interests) shall be adjusted, Reinstated, or cancelled, as determined by the Debtors with the consent of the Required Consenting Creditors.

**c.** *Voting.* Interests in Class 8 are either (i) Unimpaired and therefore each holder of a Class 8 Interest is conclusively presumed to have accepted the Plan or (ii) Impaired and not receiving any distribution under the Plan and therefore each holder of a Class 8 Interest is conclusively deemed to have rejected the Plan. Therefore, in each case, each holder of a Class 8 Interest is not entitled to vote on the Plan.

**9. Class 9 – Existing Equity Interests**

**a.** *Classification.* Class 9 consists of all Existing Equity Interests.

**b.** *Treatment.* On the Effective Date, all Existing Equity Interests shall be cancelled, released, extinguished, and discharged, and will be of no further force or effect. The holder of Existing Equity Interests shall receive no recovery or distribution on account of the Existing Equity Interests.

**c.** *Voting.* Class 9 is Impaired. The holder of Class 9 Interests is conclusively deemed to have rejected the Plan and is, therefore, not entitled to vote on the Plan.

### D. Reservation of Rights Regarding Claims

Except as otherwise provided in the Plan or in any Final Order of the Bankruptcy Court, nothing herein shall affect the Debtors' or the Reorganized Debtors' rights with respect to any Claim, including all rights in respect of legal or equitable defenses to, or setoffs or recoupments in relation to, any such Claims.

### E. Postpetition Interest on Claims

Except as required by the Bankruptcy Code, postpetition interest shall not accrue or be payable on account of any Claim.

### F. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## III. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

### A. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors are seeking Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to the Classes that are deemed to reject or that vote to reject the Plan, and the Plan constitutes a motion for such non-consensual Confirmation.

### B. Elimination of Vacant Classes

Any Class of Claims that does not have any Claims as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code.

## IV. MEANS OF IMPLEMENTATION

### A. Operations Between the Confirmation Date and Effective Date

During the period from the Confirmation Date through the Effective Date, the Debtors may continue to operate their businesses as debtors-in-possession in the ordinary course in a manner

consistent with past practice in all material respects, and as otherwise necessary to consummate the Plan, in all cases in accordance with the Restructuring Support Agreement, subject to all applicable orders of the Bankruptcy Court.

**B. Sources of Cash for Plan Distributions**

Cash payments or distributions to be made hereunder shall be funded from the existing Cash of the Debtors and the Cash proceeds of the Exit Facility.

**C. Issuance of New Equity Interests**

On the Effective Date, the Reorganized Debtors shall be authorized to issue and deliver (or cause to be issued and delivered) the New Equity Interests without the need for any further corporate or shareholder action subject to Article IV.L. The New Equity Interests, when so issued and delivered, shall be duly authorized, validly issued, fully paid and non-assessable. Subject to Article VI.B of the Plan (New Equity Interests Reserve), Article VI.M of the Plan (L/C Reserve), and Article VI.N of the Plan (Revolving L/C Reserve), on the Effective Date, one hundred percent (100%) of the New Equity Interests shall be held by the holders of Allowed First Lien Secured Claims (subject to dilution by any New Equity Interests issued as Exit Facility Participation Consideration, as Backstop Consideration, or under any Management Incentive Plan).

To the extent the New Equity Interests are Securities, the issuance and distribution of the New Equity Interests on account of the Allowed First Lien Secured Claims (including with respect to Exit Facility Participation Consideration) and issued as Backstop Consideration shall be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code. To the extent section 1145 is unavailable, including for any New Equity Interests that are issued to the Backstop Parties as Exit Facility Participation Consideration for the portion of the Exit Facility that was unsubscribed and funded by a Backstop Party, issuance and distribution of the New Equity Interests (if Securities) shall be exempt from SEC registration as a private placement pursuant to section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D promulgated thereunder, or such other exemption as may be available from any applicable registration requirements and such similar federal, state and local laws.

All New Equity Interests authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code), subject to: (1) compliance with any rules and regulations of the SEC or other federal, state, local or and foreign securities laws applicable at the time of any future transfer of such New Equity Interests, and obtaining any applicable regulatory approvals and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Equity Interests are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act or the safe harbor of Regulation D promulgated thereunder, such shares of New Equity Interests will be considered "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law, and may not be resold by the recipients thereof except

pursuant to an effective registration statement under the Securities Act or an available exemption thereunder.

Should the Reorganized Debtors elect to reflect any ownership of the New Equity Interests to be issued under the Plan through the facilities of the DTC, the DTC is authorized to rely solely on the Plan and the Confirmation Order, and the Reorganized Debtors need not provide any further evidence other than the Plan and the Confirmation Order with respect to the treatment of such New Equity Interests under applicable securities laws. The DTC and all other Persons and Entities shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Equity Interests (to the extent they are deemed to be Securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**D. Exit Facility**

On the Effective Date, the applicable Reorganized Debtors shall execute and deliver the Exit Facility Documents, consistent with the Restructuring Support Agreement. The Reorganized Debtors shall be authorized to borrow under the Exit Facility and shall use the proceeds of the Exit Facility for any purpose permitted thereunder. Without limiting the foregoing, the Reorganized Debtors shall pay, as and when due, all fees, expenses, losses, damages, indemnities and other amounts provided for under the Exit Facility Documents.

Confirmation of the Plan shall be deemed (a) approval (or, to the extent previously approved by Final Order of the Bankruptcy Court, ratification) of the Exit Facility and all transactions contemplated thereby, including the Backstop Commitment Letter and the Backstop Consideration and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, expenses, losses, damages, indemnities and other amounts provided for by the Exit Facility Documents, and (b) authorization (or, to the extent previously authorized by Final Order of the Bankruptcy Court, ratification) for the Reorganized Debtors to enter into and perform under the Exit Facility Documents, including the Backstop Commitment Letter. Obligations incurred under the Exit Facility Documents shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Documents shall be deemed to have been extended, in good faith, for legitimate business purposes, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed granted and shall deemed to be approved by the Bankruptcy Court; (b) shall be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder; (c) shall be deemed perfected on the Effective Date; (d) shall

have the priorities set forth in the Exit Facility Documents, subject only to such Liens and security interests as may be expressly permitted under the Exit Facility Documents; (e) shall be deemed to have been the result of good faith, arm's-length negotiations between, without limitation, the Debtors and the administrative agent, collateral agent, lenders, and other secured parties under the Exit Facility Documents, (f) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever; and (g) shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the secured parties (and their designees and agents) under the Exit Facility Documents are authorized to make all filings and recordings, and obtain all governmental approvals and consents, if any, necessary to perfect such Liens and security interests under the provisions of the applicable state, provincial, federal or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order and thereafter shall cooperate to make all other filings and recordings that would be necessary under applicable law to give notice of such Liens and security interests to third parties; *provided, however*, that, notwithstanding the foregoing, perfection of the Liens and security interests granted under the Exit Facility Documents shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals and consents shall not be necessary or required. To the extent that any holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such holder, has filed or recorded any Liens and/or security interests to perfect such holder's Lien or security interest, then as soon as practicable on or after the Effective Date, such holder (or the agent for such holder), at the Reorganized Debtors' expense, shall take any and all steps requested by the Debtors, Reorganized Debtors or any administrative agent under the Exit Facility Documents that are necessary to cancel and/or extinguish such Liens and/or security interests (it being understood that such Liens and security interests held by holders of Secured Claims that are satisfied on the Effective Date pursuant to the Plan shall be automatically canceled and extinguished on the Effective Date by virtue of the entry of the Confirmation Order).

Immediately following the Effective Date, in exchange for good and valuable consideration, including the release and discharge of certain Claims and Cause of Action against the Debtors, the provision of operation, maintenance, management, administrative and other services in the Chapter 11 Cases, and the provision of additional services to orderly transition the operations of the Debtors from GenOn to the Debtors or their designees, the Reorganized Debtors shall pay the GenOn Exit Facility Payment to GenOn from the proceeds of the Exit Facility. GenOn shall provide, at least three Business Days prior to the Effective Date, a notice specifying the aggregate amount of the asserted GenOn Transition and Releases Fee together with a reasonably detailed calculation of the GenOn Transition and Releases Fee utilizing the categories set forth in the definition thereof.

Notwithstanding anything to the contrary in the Restructuring Support Agreement or herein, to the extent the Restructuring Support Agreement has not terminated before the Effective

Date, the occurrence of the Effective Date shall not relieve the Debtors or the Reorganized Debtors (as applicable) of the obligation to make the GenOn Exit Facility Payment.

### E. Continued Corporate Existence

Except as otherwise set forth in the Restructuring Transaction Steps, each Debtor shall, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended under the Plan or otherwise with the consent of the Required Consenting Creditors, and to the extent such documents are so amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### F. Disbursing Agent

The Debtors (with the prior written consent of the Required Consenting Creditors) and the Reorganized Debtors, as applicable, shall designate one or more Entities (which may be the Reorganized Debtors) to effectuate the Distributions. If the Disbursing Agent is a third party, the reasonable fees and expenses of the Disbursing Agent shall be paid by the Debtors or Reorganized Debtors upon submission of statements. The payment of the reasonable fees and expenses of the Disbursing Agent shall be made in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court. The Disbursing Agent shall be deemed exculpated and indemnified by the Estates, except for any liability arising from fraud, *ultra vires* actions, willful misconduct, criminal conduct or gross negligence by the Disbursing Agent or any of its agents or representatives.

### G. New Board of Directors/Officers

On the Effective Date, all Persons acting as directors and/or managers of the Debtors that have not been selected as directors and/or managers of the Reorganized Debtors shall be deemed to have resigned, their appointments shall be rescinded for all purposes, and their respective authority and power, in their capacities as such, shall be revoked, in each case, without the necessity of taking any further action in connection therewith subject to Article IV.L.

The number of directors that will initially be members of the New Board shall be set forth in the New Organizational Documents or otherwise set forth in the Plan Supplement. The classification and composition of the New Board shall be consistent with applicable non-bankruptcy law and the terms of the Reorganized Parent's New Organizational Documents. Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the Debtors shall disclose, in the Plan Supplement, the identity and affiliations of the Persons proposed to serve on the New Board. The New Board members shall serve from and after the Effective Date in accordance with applicable non-bankruptcy law and the terms of the Reorganized Parent's New

Organizational Documents. As of the Effective Date, each Reorganized Debtor shall be authorized to procure and maintain directors' and officers' liability insurance policies for the benefit of its respective directors, officers, members, trustees and managers in the ordinary course of business.

**H. Management Incentive Plan**

The percentage of New Equity Interests reserved for issuance under a Management Incentive Plan, if any, shall be determined by the Required Consenting Creditors in their sole discretion and set forth in the New Organizational Documents or otherwise set forth in the Plan Supplement. Following the Effective Date, the New Board shall have the authority to determine all terms and conditions (including with respect to allocation, form, structure, participation, and vesting) of, and direct the implementation of, any Management Incentive Plan, in each case subject to the terms of the New Organizational Documents.

**I. Retained Causes of Action**

Except as otherwise provided in Article X or the other provisions of the Plan, as of the Effective Date, each Cause of Action of the Debtors shall be preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the applicable Reorganized Debtor. Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, expressly reserve such Cause of Action for later adjudication and, accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of the Confirmation, the Plan, the vesting of such Cause of Action in the Reorganized Debtors, any order of the Bankruptcy Court or these Chapter 11 Cases. **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or Reorganized Debtors, as applicable, will not pursue such Cause of Action.** Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain the Retained Causes of Action that the Debtors or the Estates may hold against any Person or Entity to the extent included on the Retained Causes of Action Schedule and not released under Article X.E hereof, including the Avoidance Actions and may, in their sole discretion, pursue or settle any such Retained Causes of Action. The Retained Causes of Action Schedule shall be included in the Plan Supplement. The inclusion or failure to include any Retained Cause of Action in the Plan Supplement shall not be deemed an admission, denial or waiver of any claims, rights or Causes of Action that any Reorganized Debtor may hold against any Person or Entity. For the avoidance of doubt, the Retained Causes of Action shall not include any Claims or Causes of Action against any Released Party to the extent released under Article X.E of the Plan.

On the Effective Date, the applicable Reorganized Debtor shall be deemed to be substituted as a party to any Retained Causes of Action litigation to which a Debtor is a party, including (but not limited to): (a) contested matters or adversary proceedings pending in the Bankruptcy Court;

(b) any appeals of orders of the Bankruptcy Court; and (c) any state court or federal or state administrative proceedings.

### J. Cancellation and Surrender of Notes, Instruments, Securities and Other Documentation

On the Effective Date, all notes, instruments, certificates and other documents evidencing Claims or Interests shall be deemed canceled and will be considered uncollectible accounts and surrendered and of no further force and effect against the Debtors or the Reorganized Debtors, without any further action on the part of the Debtors or the Reorganized Debtors; provided, however, that solely for purposes of preserving all rights relating to the Consenting Creditor Preserved Claims, and notwithstanding the occurrence of the Effective Date, (i) the Credit Agreement shall remain in effect subject to the discharge and injunction provisions of the Confirmation Order, and (ii) the Amended and Restated Limited Liability Company Agreement of Shawville Power, LLC shall remain in effect.

Notwithstanding anything to the contrary herein, to the extent not previously paid by the Debtors, on or as soon as practical after the Effective Date, the Reorganized Debtors shall pay in full in Cash all Agent Expenses to the extent invoiced.

### K. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan or the Restructuring Transactions, on the Effective Date, subject to receipt of the applicable Distributions, if applicable, all Liens on and security interests in the property of any Estate shall be fully released and discharged.

The Agents shall (i) execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such Liens and security interests, and (ii) authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable.

### L. Effectuating Documents; Further Transactions

Following entry of the Confirmation Order, but subject to the occurrence of the Effective Date, the Reorganized Debtors shall take all actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of the Plan and the Restructuring Transactions, including (i) implementation of any restructuring steps, (ii) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, cancellation, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, (iv) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, cancellation, or dissolution pursuant to applicable foreign, state, territorial,

provincial, or federal law, (v) the issuance of the New Equity Interests, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, (vi) taking necessary steps under applicable local law to effectuate the Plan; and (vii) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or the Restructuring Support Agreement, as applicable, to fully effectuate the Plan.

Each officer, legal representative or member of the board of directors of the Debtors is authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Definitive Documents and the New Equity Interests issued pursuant to the Plan in the name of and on behalf of the Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the directors or managers of the Debtors) except for those expressly required pursuant to the Plan. The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

Each officer, legal representative or member of the board of directors of the Reorganized Debtors is authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Definitive Documents and the New Equity Interests issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the directors or managers of the Debtors) except for those expressly required pursuant to the Plan. The secretary and any assistant secretary of each Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions.

Unless otherwise agreed to by the Debtors and the Required Consenting Creditors, all matters provided for herein involving the corporate structure of the Debtors or Reorganized Debtors, or any corporate, limited liability company, or related action required by the Debtors or Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the stockholders, members, board, or officers or directors of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, or officers, as applicable, of the Debtors or Reorganized Debtors.

To the extent required under the Plan or applicable non-bankruptcy law, on or immediately prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall file the New Organizational Documents with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code or applicable non-bankruptcy law, the New Organizational Documents will include a provision prohibiting the issuance of non-voting equity

securities. After the Effective Date, the Reorganized Debtors may amend and restate the New Organizational Documents or other analogous organizational documents, as permitted by the terms thereof and applicable law and may file amended and restated certificates of incorporation (or other formation documents, if applicable) with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation. On the Effective Date, the holders of the New Equity Interests shall be deemed to be bound by the Reorganized Parent's New Organizational Documents, in each case without the need for execution by any party thereto.

### M. Additional Implementing Transactions

On the Effective Date, the applicable Debtors shall, in accordance with the Restructuring Support Agreement and subject to the consent rights thereunder, enter into any transaction and shall take any actions, in each case, as may be necessary or appropriate to effect the Restructuring Transactions, including, as applicable, the issuance of all securities, notes, instruments, certificates and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions.

### N. Section 1146 Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring Transaction authorized by this Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including, without limitation: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under or pursuant to the Plan.

### O. Registration Rights Agreement

If elected by the Required Consenting Creditors, on the Effective Date, the Registration Rights Agreement shall be executed by the Reorganized Debtors and the other parties thereto and shall be valid, binding, and enforceable in accordance with its terms.

### P. Insurance Policies

All insurance policies, surety bonds, and indemnity agreements to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as Executory Contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms, unless any such insurance policy, surety

bond, or indemnity agreement is included in the Rejection Schedule. Unless any such insurance policy is included in the Rejection Schedule, nothing in the Plan, including any releases, shall diminish or impair the enforceability of any insurance policies that may cover insurance claims or other claims against the Debtors or any other Person and such policies shall continue in full force and effect after the Effective Date in accordance with their respective terms.

**Q. New Castle HRCO**

On the Effective Date, unless the New Castle HRCO is accelerated, terminated or liquidated by Tenaska prior to the Effective Date, the Debtors shall be deemed to have assumed the New Castle HRCO under section 365 of the Bankruptcy Code without any further order of the Bankruptcy Court.

On the Effective Date, if agreed to by Tenaska, Heritage Power Marketing, LLC, as reorganized, shall execute the New Castle HRCO Amendment. If Tenaska is unwilling or unable to consent to the execution of the New Castle HRCO Amendment on the terms set forth herein and in the Restructuring Support Agreement, Heritage Power Marketing, LLC, as reorganized, shall execute the New Castle Contribution Agreement on the Effective Date.

If the New Castle Contribution Agreement is executed pursuant to this Article IV.Q of the Plan, Confirmation of the Plan shall be deemed (a) approval of the New Castle Contribution Agreement and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and (b) authorization for the Reorganized Debtors to enter into and perform under the New Castle Contribution Agreement. Obligations incurred under the New Castle Contribution Agreement (if the New Castle Contribution Agreement is executed) shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The obligations incurred under the New Castle Contribution Agreement (if the New Castle Contribution Agreement is executed) shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

On the Effective Date, if the New Castle Contribution Agreement is executed pursuant to this Article IV.Q of the Plan, all of the Liens and security interests to be granted in accordance with the New Castle Contribution Agreement (a) shall be deemed granted and shall deemed to be approved by the Bankruptcy Court; (b) shall be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder; (c) shall be deemed perfected on the Effective Date; (d) shall have the priorities set forth in the New Castle Contribution Agreement; (e) shall be deemed to have been the result of good faith, arm's-length negotiations between the parties thereto; (f) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever; and (g) shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and GenOn (and their designees and agents) are authorized to make all filings and recordings, and obtain all governmental approvals and consents, if any, necessary to perfect any such Liens and security interests under the provisions of the applicable state, provincial, federal or other law (whether domestic or foreign) that would

be applicable in the absence of the Plan and the Confirmation Order and thereafter shall cooperate to make all other filings and recordings that would be necessary under applicable law to give notice of any such Liens and security interests to third parties; *provided, however*, that, notwithstanding the foregoing, if the New Castle Contribution Agreement is executed pursuant to this Article IV.Q of the Plan, perfection of the Liens and security interests granted under the New Castle Contribution Agreement shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals and consents shall not be necessary or required.

If the New Castle HRCO is accelerated, terminated, or liquidated by Tenaska after the Petition Date but prior to the Effective Date, the New Castle Reimbursable Amounts shall be reimbursed to GenOn as part of the payment of the GenOn Transition and Releases Fee.

**R. L/C Facilities**

If elected by the Required Consenting Creditors, the applicable Reorganized Debtors shall enter into a New L/C Facility. Without limiting the foregoing, the Reorganized Debtors shall pay, as and when due, all fees, expenses, losses, damages, indemnities and other amounts provided for under the New L/C Facility Documents (if any).

If the New L/C Facility is entered into on or after the Effective Date by the applicable Reorganized Debtors pursuant to this Article IV.R of the Plan, then Confirmation of the Plan shall be deemed (a) approval of the New L/C Facility and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, expenses, losses, damages, indemnities and other amounts provided for by the New L/C Facility Documents, and (b) authorization for the Reorganized Debtors to enter into and perform under the New L/C Facility Documents. Obligations incurred under the New L/C Facility Documents (if any) shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New L/C Facility Documents (if any) shall be deemed to have been extended, in good faith, for legitimate business purposes, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

If the New L/C Facility is entered by the applicable Reorganized Debtors pursuant to this Article IV.R of the Plan, all of the Liens and security interests to be granted in accordance with the New L/C Facility (a) shall be deemed granted and shall deemed to be approved by the Bankruptcy Court; (b) shall be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder; (c) shall be deemed perfected on the Effective Date; (d) shall have the priorities set forth in the New L/C Facility Documents; (e) shall be deemed to have been the result of good faith, arm's-length negotiations between the parties thereto; (f) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever; and (g) shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors (and their designees and agents) are authorized to make all filings and recordings, and obtain all governmental approvals and consents, if any, necessary

to perfect any such Liens and security interests under the provisions of the applicable state, provincial, federal or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order and thereafter shall cooperate to make all other filings and recordings that would be necessary under applicable law to give notice of any such Liens and security interests to third parties; *provided, however*, that, notwithstanding the foregoing, if the New L/C Facility is entered by the applicable Reorganized Debtors pursuant to this Article IV.R of the Plan, perfection of the Liens and security interests granted under the New L/C Facility shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals and consents shall not be necessary or required.

Regardless of whether a New L/C Facility is established, in accordance with the Restructuring Support Agreement, if GenOn makes any payment to Macquarie or any of its Affiliates or any other Person or Entity pursuant to the GenOn Participation on account of a drawing of a letter of credit under the Macquarie's Project L/C Loan Commitment occurring after the Effective Date, then the Reorganized Debtors shall reimburse GenOn for such payment.

**S. Shawville Lease Documents**

On or prior to the Effective Date, the applicable Debtors shall execute the Shawville Lease Documents Amendments.

**T. Litigation Trust**

On or prior to the Effective Date, if elected by the Required Consenting Creditors, the trustee of the Litigation Trust shall execute the Litigation Trust Agreement for the benefit of the holders of the Litigation Trust Interests, which Litigation Trust Agreement shall be consistent with the Restructuring Support Agreement and the Claims Preservation Agreement. If a Litigation Trust is created pursuant to the terms hereof, (a) on the later of (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date on which such Loan Claim becomes Allowed, or as soon as reasonably practicable thereafter, each holder of an Allowed Loan Claim shall be issued its pro rata share (calculated as the proportion of its Allowed Loan Claim to the aggregate amount of all Allowed Loan Claims) of the Litigation Trust Interests and (b) as of the Effective Date, the Administrative Agent shall be deemed to have transferred and assigned all of its respective right, title and interest in and to all of the Consenting Creditor Preserved Claims, which right, title, and interest shall automatically vest in the Litigation Trust free and clear of all Claims, Liens, encumbrances, charges, Interests and other interests, subject only to the terms of the Claims Preservation Agreement and the Litigation Trust Agreement. Any such assignment shall be deemed to be effective and valid for all purposes. On the Effective Date, the Litigation Trust, if any, shall become effective for the sole benefit of the holders of Litigation Trust Interests and shall be deemed to be valid, binding and enforceable in accordance with the terms and provisions of this Plan and the Litigation Trust Agreement. After the Effective Date, the Litigation Trust Agreement, if any, may be amended in accordance with its terms without further order of the Bankruptcy Court (provided that any such amendment will be consistent with the Claims Preservation Agreement).

The organization and governance of the Litigation Trust (if any), including the identity of the trustee thereunder, shall be determined by the Required Consenting Creditors in their sole discretion (provided that all organizational and governance terms comply in all respects with the

terms of the Claims Preservation Agreement, including the restrictions on the issuance and assignability of the Litigation Trust Interests). The Litigation Trust (if any), via its trustee, shall have the authority to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment the Consenting Creditor Preserved Claims, in each case, subject to the Litigation Trust Agreement. No Person or Entity (other than the holders of Litigation Trust Interests to the extent set forth in the Litigation Trust Agreement) shall have the right to direct or otherwise affect the actions of the Litigation Trust or its trustee (if any).

If elected by the Required Consenting Creditors prior thereto, on the Effective Date the Litigation Trust (if any) shall be funded with proceeds of the Exit Facility, in all cases in accordance with the Exit Facility Documents (the **"Exit Facility Trust Funding"**). The members of the New Board and the holders of New Equity Interests (in each case solely in their capacities as such) shall not be subject to any liability to any Person in connection with any action taken or not taken with respect to the Litigation Trust (if any), including in connection with the Exit Facility Trust Funding or any other funding of any such Litigation Trust.

Notwithstanding the foregoing, nothing in this Plan is intended, or shall be deemed or construed, to (i) be a waiver of any right, power or remedy under the Claims Preservation Agreement by any party thereto, (ii) be an amendment to or waiver of any term in the Claims Preservation Agreement, (iii) be a consent to any action in violation of or that is otherwise inconsistent with the terms of the Claims Preservation Agreement, or (iv) in any way prevent, prejudice, or impair the rights of any party to the Claims Preservation Agreement to enforce the Claims Preservation Agreement or pursue claims preserved thereunder.

The trustee of the Litigation Trust shall distribute, on a periodic basis, to the holders of the Litigation Trust Interests, any net Cash proceeds that may be generated from the Consenting Creditor Preserved Claims, as set forth in the Litigation Trust Agreement.

**U. Transition Services Agreement; Employee Matters**

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed the Transition Services Agreement under section 365 of the Bankruptcy Code without any further order of the Bankruptcy Court (to the extent the Transition Services Agreement is still in effect).

In accordance with the Transition Services Agreement and subject to the terms thereof, the Debtors or their designee(s) will assume GES's obligations under the collective bargaining agreements (other than any obligations regarding pensions and other post-employment benefits) and will make offers to employ the Heritage Dedicated Employees (as such term is defined in the Transition Services Agreement) as required by Section 2.11(b) of the Transition Services Agreement.

In addition, if requested by the Required Consenting Creditors, GenOn will provide (i) continued management of the Debtors and (ii) personnel to continue to serve as officers or other management personnel of the Debtors or the Reorganized Debtors, as applicable, in each case while the Transition Services Agreement is in effect and solely in accordance with the terms of the Transition Services Agreement.

Upon the entry of the Confirmation Order, the Replacement Operator Agreements shall be

deemed to have been approved by the Bankruptcy Court and the Debtors or Reorganized Debtors, as applicable, shall be authorized to enter into and perform under the New Operator Agreements without any further order of the Bankruptcy Court.

### V. New Revolving Loan Facility

If elected by the Required Consenting Creditors, the applicable Reorganized Debtors shall enter into a New Revolving Loan Facility. Without limiting the foregoing, the Reorganized Debtors shall pay, as and when due, all fees, expenses, losses, damages, indemnities and other amounts provided for under the New Revolving Loan Facility Documents (if any).

If the New Revolving Loan Facility is entered into by the applicable Reorganized Debtors pursuant to this Article IV.V of the Plan, Confirmation of the Plan shall be deemed (a) approval of the New Revolving Loan Facility and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, expenses, losses, damages, indemnities and other amounts provided for by the New Revolving Loan Facility Documents, and (b) authorization for the Reorganized Debtors to enter into and perform under the New Revolving Loan Facility Documents. Obligations incurred under the New Revolving Loan Facility Documents (if any) shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the New Revolving Loan Facility Documents (if any) shall be deemed to have been extended, in good faith, for legitimate business purposes, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.

If the New Revolving Loan Facility is entered by the applicable Reorganized Debtors pursuant to this Article IV.V of the Plan, all of the Liens and security interests to be granted in accordance with the New Revolving Loan Facility (a) shall be deemed granted and shall deemed to be approved by the Bankruptcy Court; (b) shall be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder; (c) shall be deemed perfected on the Effective Date; (d) shall have the priorities set forth in the New Revolving Loan Facility Documents; (e) shall be deemed to have been the result of good faith, arm's-length negotiations between the parties thereto; (f) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever; and (g) shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors (and their designees and agents) are authorized to make all filings and recordings, and obtain all governmental approvals and consents, if any, necessary to perfect any such Liens and security interests under the provisions of the applicable state, provincial, federal or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order and thereafter shall cooperate to make all other filings and recordings that would be necessary under applicable law to give notice of any such Liens and security interests to third parties; *provided, however*, that, notwithstanding the foregoing, if the New Revolving Loan Facility is entered by the applicable Reorganized Debtors pursuant to this Article IV.V of the Plan, perfection of the Liens and security interests granted under the Revolving Loan Facility shall occur

automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals and consents shall not be necessary or required.

# V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A. Assumption and Rejection of Executory Contracts and Unexpired Leases

As of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed assumed, together with all amendments agreed to in writing between the Debtor(s) and the Executory Contract or Unexpired Lease counterparty, unless such Executory Contract or Unexpired Lease (i) was previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is listed on the Rejection Schedule or (iii) is the subject of a motion filed by a Debtor for assumption or rejection under section 365 of the Bankruptcy Code that is pending before the Bankruptcy Court or subject to a pending appeal.

Notwithstanding anything to the contrary in the Plan, (i) the Debtors shall have the right to alter, amend, modify, or supplement the Rejection Schedule at any time until the Effective Date, and (ii) the Reorganized Debtors shall have the right to alter, amend, modify, or supplement the Rejection Schedule at any time from the Effective Date through and including 45 days after the Effective Date.

## B. Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court's order, any Proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease must be filed with the Claims and Noticing Agent by the Rejection Damages Deadline. Any Claim arising from the rejection of an Executory Contract or Unexpired Lease, with respect to which no Proof of Claim is timely filed, shall be automatically disallowed without the need for any objection or further notice to or action or approval of the Bankruptcy Court.

Holders of Claims arising from the rejection of Executory Contracts or Unexpired Leases with respect to which no Proof of Claim is timely filed shall be forever barred, estopped, and enjoined from asserting a Claim based on such rejection against the Debtors, the Reorganized Debtors, the Estates or the respective property of any of the foregoing, and such Claims shall be discharged as of the Effective Date unless otherwise expressly ordered by the Bankruptcy Court.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of the obligations owed by the counterparty to the applicable Debtor(s) thereunder. Notwithstanding any applicable non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations from the counterparties to the rejected Executory Contracts or Unexpired Leases.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of the Executory Contracts and Unexpired Leases set forth in the Plan or the Rejection Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final

Order. Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption.

### C. Cure Claims

Cure Claims under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, by the applicable Reorganized Debtor(s), or on such other terms as the parties to any particular Executory Contract or Unexpired Lease may agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the applicable Reorganized Debtor(s) or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims shall be satisfied following the entry of a Final Order resolving the dispute and approving the assumption. Subject to satisfaction of the applicable Cure Claim, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults thereunder, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising at any time before the effective date of the assumption. **Any liabilities reflected in the Schedules with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

To the extent the Debtors or the Reorganized Debtors, as applicable, and the objecting counterparty cannot resolve their dispute consensually, the Bankruptcy Court shall retain jurisdiction to resolve such dispute.

### D. Reservation of Rights

Neither the listing of any contract or lease on the Rejection Schedule, nor the Debtors' delivery of a notice of assumption to the applicable counterparty shall constitute an admission by the Debtors that a particular contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

### E. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to

provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

### F. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all executed modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### G. Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor and any Executory Contracts and Unexpired Leases that were assumed by such Debtor and subsequently amended, modified, supplemented, or restated in a writing executed by such Debtor, will be performed by such Debtor or the Reorganized Debtors liable thereunder in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## VI. PROVISIONS GOVERNING DISTRIBUTIONS

### A. Method of Distributions to Holders of Claims

All Distributions to be made under the Plan shall be made by the Disbursing Agent to the applicable holders of Allowed Claims or the New Equity Interests Reserve in accordance with the terms of this Plan.

Unless a holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Unless a holder of an Allowed Claim and the Disbursing Agent otherwise agree, Cash Distributions shall be made in U.S. Dollars. Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

Except as otherwise provided in the Plan, Distributions shall be made to the holders of record of Allowed Claims as of the Distribution Record Date at the last known address, as identified in: (i) the most recently filed Proof of Claim; (ii) at the address set forth in any written notice of address change delivered to the Debtors after the date of the most recently filed Proof of

Claim or where no Proof of Claim was filed; (iii) at the address reflected in the Schedules if no Proof of Claim has been filed and the Debtors have not received a written notice of a change of address; or (iv) if clauses (i) through (iii) are not applicable, at the last address directed by such holder.

### B. New Equity Interests Reserve

Distributions of any Reserved Interests shall be made to the New Equity Interests Reserve. Any Reserved Interests shall be held in the New Equity Interests Reserve, and the Disbursing Agent shall distribute any such Reserved Interests to the applicable Reserve Holders only at the following time: (a) as soon as reasonably practicable following the date on which the Reorganized Debtors (i) obtain approval from FERC under section 203 of the FPA as required to distribute the Reserved Interests to the Reserve Holder or (ii) determine in their reasonable judgment on the advice of counsel that such approval is not required or (b) as soon as reasonably practicable following the date on which such New Equity Interests no longer constitute Reserved Interests. Subject in each case to compliance with applicable law (including applicable securities law) or agreements (including the New Organizational Documents), (a) Reserve Holders may direct the Disbursing Agent to sell or otherwise dispose of any of their Reserved Interests held in the New Equity Interests Reserve for cash and distribute the net proceeds of such sale or disposition to the Reserve Holder, provided that the Disbursing Agent shall have no obligation to identify a purchaser or otherwise support efforts to sell or dispose of the Reserved Interests, and (b) any cash dividends or cash distributions received by the Disbursing Agent on account of the Reserved Interests held in the New Equity Interests Reserve shall, as soon as reasonably practicable after such receipt, be distributed by the Disbursing Agent to the applicable Reserve Holder.

### C. Undeliverable Distributions and Time Bar to Cash Payments

In the event a Distribution is returned as undeliverable, or no address for a particular holder is found in the Debtors' records, no further Distributions to such holder shall be made unless and until the Disbursing Agent is notified in writing of such holder's then-current address, at which time a Distribution shall be made to such holder on the next Periodic Distribution Date. The Disbursing Agent in its sole discretion may, but shall have no obligation to, attempt to locate the holders entitled to receive undeliverable Distributions. Any Distributions returned to the Disbursing Agent as undeliverable shall remain in the possession of the Reorganized Debtors until such time as a Distribution becomes deliverable; provided that any Distribution that remains undeliverable for six months or is represented by a voided check shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall re-vest in the Reorganized Debtors automatically without need for any Bankruptcy Court order, notwithstanding any federal or state escheat laws to the contrary.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the Entity to whom such check was originally issued. Any claim in respect of a voided check shall be made within thirty (30) days after the date upon which such check was deemed void. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred.

The Disbursing Agent shall not incur any liability whatsoever on account of any Distribution, except to the extent arising from fraud, *ultra vires* actions, willful misconduct, criminal conduct or gross negligence by the Disbursing Agent or any of its agents or representatives.

**D. Distribution Record Date**

As of 5:00 p.m. (prevailing Central Time) on the Distribution Record Date, the transfer registers for Claims shall be closed. The Disbursing Agent shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes to recognize and make Distributions only to those holders who are holders of Claims as of 5:00 p.m. on the Distribution Record Date.

**E. Minimum Distributions**

No Distribution of less than one hundred dollars ($100.00) shall be made by the Disbursing Agent. Each such Distribution shall become available for Distribution to the holders of other Allowed Claims in the applicable Class.

**F. Fractional Payments and Distributions**

Whenever the Plan would otherwise call for the payment of a fraction of a dollar to any Person or Entity, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under the Plan remains undistributed as a result of the aforementioned rounding, such Cash shall re-vest in the Reorganized Debtors automatically without need for any Bankruptcy Court order.

**G. No Fractional Shares**

No fractional shares of New Equity Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of a number of shares of New Equity Interests that is not a whole number, such number shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number, and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of authorized and/or issued shares of New Equity Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

**H. Compliance with Tax Requirements**

To the extent applicable, in connection with making Distributions, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on the Reorganized Debtors by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements (with any amount so withheld and paid over to the applicable Governmental Unit treated as having been paid to and received by the Person in respect

of which such withholding was made for all purposes of the Plan). The Disbursing Agent shall be authorized to require each holder of an Allowed Claim to provide it with an executed Form W-9, applicable Form W-8 or other appropriate tax form or documentation as a condition precedent to being sent a Distribution. The Disbursing Agent shall provide advance written notice of such requirement to each holder of an Allowed Claim. The notice shall provide each holder with a specified time period after the date of mailing of such notice to provide an executed Form W-9, applicable Form W-8 or other tax form or documentation to the Disbursing Agent. If a holder of an Allowed Claim does not provide the Disbursing Agent with an executed Form W-9, applicable Form W-8 or other tax form or documentation within the time period specified in such notice, or such later time period agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding or (b) determine that such holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Reorganized Debtors for Distribution on account of other Allowed Claims in the applicable Class, and the Claim of the holder originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court. The Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, Liens and encumbrances.

### I. Setoffs and Recoupment

Except with respect to Claims released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disbursing Agent and/or the Reorganized Debtors, as applicable, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off any Allowed Claim (and the Distributions to be made on account of such Claim) against all counterclaims, rights and Causes of Action of any nature that the applicable Debtor may have held against the holder of such Claim or exercise recoupment with respect thereto; provided, however, that the failure to effectuate such a setoff shall not constitute a waiver or release by the applicable Debtor of any Cause of Action against any holder of a Claim.

In no event shall any holder of Claims against, or Interests in, the Debtors be entitled to set off or exercise recoupment in relation to any claim, right, or Cause of Action of any Debtor or Reorganized Debtor, unless (a) the Debtors (with the consent of the Required Consenting Creditors) or Reorganized Debtors, as applicable, have consented or (b) on or before the Effective Date, (i) the Bankruptcy Court has entered a Final Order granting a motion filed by such holder requesting the authority to perform such setoff or recoupment or (ii) such holder has actually performed such recoupment and provided prior notice thereof, in each case, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff or recoupment. Notwithstanding the foregoing, this paragraph does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence prior to the Effective Date.

### J. Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims (including for tax purposes) shall be allocated first to the principal

amount of such Allowed Claims (to the extent thereof) with any excess allocated to unpaid interest, if any, accrued before the Petition Date.

### K. Claims Paid or Payable by Third Parties

#### 1. Claims Paid by Third Parties or as L/C Reimbursement Payments

To the extent that a holder of an Allowed Claim receives a payment from a third party or an L/C Reimbursement Payment, the Disbursing Agent shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of such payment or L/C Reimbursement Payment, and such Claim shall be disallowed or deemed satisfied to the extent of the third party payment or L/C Reimbursement Payment received and subsequently retained, without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

To the extent a holder of an Allowed Claim receives, on account of such Claim, both a Distribution hereunder and a payment from a third party or an L/C Reimbursement Payment, such holder shall return to the applicable Reorganized Debtor within 14 days any Distribution received by such holder to the extent such holder's aggregate recovery on account of its Allowed Claim exceeds the Allowed amount of such Claim.

#### 2. Claims Payable by Insurance

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an insurance policy, such Claim shall be paid from the proceeds of such insurance policy, with the balance, if any, treated in accordance with the provisions of this Plan. No Distributions shall be made on account of any Allowed Claim that is payable pursuant to any insurance policy until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that any insurer agrees to satisfy in full or in part an Allowed Claim, then, immediately upon such insurer's agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### L. No Interest on Disputed or Delayed Distributions

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable law, no holder of a Claim shall be entitled to any interest accruing on such Claim on or after the Petition Date, notwithstanding any dispute or other delay with respect to any Distribution.

**M. L/C Reserve**

In the event that (i) no New L/C Facility is entered into replacing the Project L/Cs prior to the Effective Date and (ii) all or a portion of the Project L/Cs remain outstanding and undrawn on the Effective Date, then on the Effective Date, the Disbursing Agent shall fund the L/C Reserve with the L/C Reserve Distribution. If the L/C Reserve is funded with the L/C Reserve Distribution and any such undrawn Project L/Cs shall become drawn and actually funded by the Project L/C Issuer after the Effective Date (such Project L/Cs that have been drawn and funded following the Effective Date, the "***Post-Effective Date Drawn L/Cs***"), then the Disbursing Agent shall make a distribution from the L/C Reserve to the Project L/C Issuer (as defined in the Credit Agreement) of such Post-Effective Date Drawn L/Cs to the extent that (i) such Project L/C Issuer would have had an Allowed L/C Reimbursement Claim on account of such Post-Effective Date Drawn L/C had it been drawn prior to the Effective Date and (ii) (x) no L/C Reimbursement Payments were made on account of such Post-Effective Date Drawn L/C or (y) the L/C Reimbursement Payments made on account of such Post-Effective Date Drawn L/C were subsequently subject to any contest, attack, avoidance, recoupment, deduction, recharacterization, clawback, turnover, subrogation, disgorgement, reversionary interest, or any other similar economic or liability exposure for whatever reason and were in fact disgorged by GenOn or not otherwise retained bv GenOn. Any such distribution shall be in an amount equal to what would have been such Project L/C Issuer's First Lien Distribution on account of such Post-Effective Date Drawn L/C had it been drawn prior to the Effective Date. Notwithstanding anything to the contrary herein, any portion of any L/C Reserve Distribution received by a Project L/C Issuer of a Project L/C shall be subject in all respects to the Plan, Confirmation Order, and all other documents related thereto, including the Exit Facility Participation Procedures, including that any rights to exercise the Exit Facility Participation Consideration shall be subject to and limited by the election deadlines applicable thereto. On the date on which there are no longer any Project L/Cs that remain outstanding (whether because they have been replaced or terminated pursuant to their terms or for any other reason), any L/C Reserve Distribution held in the L/C Reserve, including any New Equity Interests, shall automatically be extinguished and cancelled.

**N. Revolving L/C Reserve**

In the event that (i) no New L/C Facility is entered into replacing the Revolving Letters of Credit prior to the Effective Date and (ii) all or a portion of the Revolving Letters of Credit remain outstanding and undrawn on the Effective Date, then on the Effective Date, the Disbursing Agent shall fund the Revolving L/C Reserve with the Revolving L/C Reserve Distribution. If the Revolving L/C Reserve is funded with the Revolving L/C Reserve Distribution and any such undrawn Revolving Letters of Credit shall become drawn and actually funded by a Prepetition Revolving L/C Issuer issuers after the Effective Date (such Revolving Letters of Credit that have been drawn and funded following the Effective Date, the "***Post-Effective Date Drawn Revolving L/Cs***"), then the Disbursing Agent shall make a distribution from the Revolving L/C Reserve to the Prepetition Revolving L/C Issuer of such Post-Effective Date Drawn Revolving L/Cs to the extent that such Prepetition Revolving L/C Issuer would have had an Allowed L/C Reimbursement Claim on account of such Post-Effective Date Drawn Revolving L/C had it been drawn prior to the Effective Date. Any such distribution shall be in an amount equal to what would have been such Prepetition Revolving L/C Issuer's First Lien Distribution on account of such Post-Effective Date Drawn Revolving L/C had it been drawn prior to the Effective Date. Notwithstanding

anything to the contrary herein, any portion of any Revolving L/C Reserve Distribution received by a Prepetition Revolving L/C Issuer of a Revolving Letter of Credit shall be subject in all respects to the Plan, Confirmation Order, and all other documents related thereto, including the Exit Facility Participation Procedures, including that any rights to exercise the Exit Facility Participation Consideration shall be subject to and limited by the election deadlines applicable thereto. On the date on which there are no longer any Revolving Letters of Credit that remain outstanding (whether because they have been replaced or terminated pursuant to their terms or for any other reason), any Revolving L/C Reserve Distribution held in the Revolving L/C Reserve, including any New Equity Interests, shall automatically be extinguished and cancelled.

## VII. CLAIMS ADMINISTRATION PROCEDURES

### A. Allowance of Claims

After the Effective Date, the Reorganized Debtors shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or released under the Plan. All settlements of Claims approved prior to the Effective Date by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, or in a zero or undetermined amount and for which no Proof of Claim has been timely filed by the applicable Bar Date, shall be expunged from the Claims register without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Where a Proof of Claim has been filed, upon payment or satisfaction of the relevant Claim, such Proof of Claim shall be expunged from the Claims register without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### B. Prosecution of Objections to Claims

#### 1. Authority to Prosecute and Settle Objections to Claims

Except as otherwise specifically provided in the Plan, prior to the Effective Date, the Debtors (with the consent of the Required Consenting Creditors) and, on and after the Effective Date, the Reorganized Debtors shall have: (i) the authority to file, withdraw or litigate to judgment, objections to Claims; (ii) the sole authority to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (iii) the sole authority to direct the Claims and Noticing Agent to adjust the Claims register to reflect any resolutions of Disputed Claims, in each case with respect to Claims against the applicable Debtor, and without any further notice to or action, order or approval by the Bankruptcy Court.

#### 2. Objections to Claims

Except as otherwise specifically provided in the Plan, any objections to Claims shall be filed on or before the later of (1) 180 days after the Effective Date; (2) such other period of limitation as may be specifically fixed by a Final Order of the Bankruptcy Court for objecting to such Claims; and (3) with respect to objections with respect to any Post-Effective Date Drawn

Revolving L/Cs or Post-Effective Date Drawn L/Cs, 30 days after the date on which there are no longer any Revolving Letters of Credit or Project L/Cs that remain outstanding (whether because they have been replaced or terminated pursuant to their terms or for any other reason).

To facilitate the efficient resolution of Disputed Claims, Reorganized Debtors shall, notwithstanding Bankruptcy Rule 3007(c), be permitted to file omnibus objections to Claims, with such limitations as imposed by the Bankruptcy Court after due notice and opportunity for to be heard.

### 3. Authority to Amend Schedules

Prior to the Effective Date, the Debtors (with the consent of the Required Consenting Creditors) and, on and after the Effective Date, the Reorganized Debtors shall have the authority to amend the Schedules with respect to any Claim (other than Claims Allowed or released hereunder) and to make Distributions based on such amended Schedules (if no Proof of Claim is timely filed in response to such amendment) without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim that was previously scheduled as undisputed, liquidated and not contingent, the Reorganized Debtors shall provide the holder of such Claim with notice of such amendment and the opportunity to file a Proof of Claim pursuant to the requirements of the Bar Date Order.

## C. Estimation of Claims

Prior to the Effective Date, the Debtors (with the consent of the Required Consenting Creditors) and, on and after the Effective Date, the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute the maximum Allowed amount of such Claim for all purposes under the Plan (including for purposes of Distributions), and the relevant Debtor or Reorganized Debtor, as the case may be, may elect to pursue any supplemental proceedings to object to any Distribution on such Claim in excess of the estimated amount.

## D. Claims Subject to Pending Actions

Except as otherwise provided herein or in a Final Order of the Bankruptcy Court, including pursuant this Article VII of the Plan, any Claim held by an Entity against which a Debtor, a Reorganized Debtor, or another party pursues an Avoidance Action or an action to recover property under sections 542, 543, 550 or 553 of the Bankruptcy Code (in each case, to the extent not released under Article X.E), shall be deemed a Disputed Claim pursuant to section 502(d) of the Bankruptcy Code, and the holder of such Claim shall not receive any Distributions on account of such Claim until such time as such Causes of Action have been resolved and, to the extent applicable, all sums due from such holder have been turned over to the Reorganized Debtors.

### E. Distributions to Holders of Disputed Claims

Notwithstanding any other provision of the Plan: (1) no Distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever; and (2) except as otherwise agreed to by the Debtors (with the prior written consent of the Required Consenting Creditors) or Reorganized Debtors, as applicable, and the holder of the Disputed Claim, no partial Distributions will be made with respect to a Disputed Claim, including with respect to any undisputed portion of such Disputed Claim, until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

On the Distribution Date that is at least 30 days after a Disputed Claim becomes an Allowed Claim (or such lesser period as the Disbursing Agent may determine), the holder of such Allowed Claim will receive (i) any Distribution to which such holder would have been entitled under the Plan as of the Effective Date if such Claim had been Allowed as of the Effective Date and (ii) all Distributions such holder would have been entitled to on all Distribution Dates between the Effective Date and the date on which such holder is receiving its initial Distribution, in each case, without any interest.

### F. Amendments to Proofs of Claim

On or after the Effective Date, a Proof of Claim may not be amended (other than solely to update or correct the name or address of the holder of such Claim) without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any amended Proof of Claim filed without such prior authorization shall be deemed disallowed in full and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

## VIII. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

### A. Conditions to the Effective Date

The Effective Date shall not occur, and the Plan shall not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Article VIII.B:

**1.** the Restructuring Support Agreement shall not have been terminated and remains in full force and effect until immediately prior to the Effective Date;

**2.** the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed;

**3.** the Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall not have been reversed or vacated and shall not be subject to a stay;

**4.** the Definitive Documents shall be consistent with the Restructuring Support Agreement and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement;

**5.** all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and delivered, as applicable;

**6.** all Exit Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived in accordance with the terms of such documentation;

**7.** all conditions precedent to the issuance of the New Equity Interests, other than the occurrence of the Effective Date, shall have been satisfied or waived by the Required Consenting Creditors;

**8.** the New Organizational Documents for the Reorganized Debtors shall have been adopted;

**9.** the Claims Preservation Agreement shall not have been terminated and remains in full force and effect, and there shall have been no material breach thereof by either GenOn or the Financial Sponsor;

**10.** all Consenting Stakeholder Fees and Expenses invoiced at least three (3) Business Days prior to the Effective Date shall have been paid in full in Cash; and

**11.** all governmental and third-party approvals and consents, including any antitrust or FERC regulatory approval, necessary in connection with the transactions contemplated by the Restructuring Support Agreement (which, for the avoidance of doubt, includes approval of a FERC 203 Application) shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions.

### B. Waiver of Conditions to the Effective Date

The conditions to consummation of the Plan set forth in Article VIII.A., other than with respect to clause 3 thereof, may be waived with the prior written consent of the Debtors, the Required Consenting Creditors and, only with respect to clauses 1, 2, 4, 5, 6, and 10 thereof, GenOn, without any notice to or approval of other parties in interest or the Bankruptcy Court.

## IX. WITHDRAWAL AND MODIFICATION OF THE PLAN

### A. Withdrawal of the Plan

Subject to the consent rights in the Restructuring Support Agreement, the Debtors reserve the right to seek to withdraw the Plan at any time prior to the Effective Date. If the Plan is withdrawn: (1) each of the Plan and the Confirmation Order shall be null and void in all respects; and (2) nothing contained in the Plan or the Confirmation Order shall (i) constitute a waiver or

release of any Claims or Interest, or any claim the Debtors have against any Entity or (ii) prejudice in any manner the rights of the Debtors or any other Entity.

### B. Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and the consent rights contained in the Restructuring Support Agreement, the Debtors reserve the right to alter, amend or modify the Plan before the Effective Date. Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as amended, modified, or supplemented, if the proposed amendment, modification, or supplement does not materially and adversely change the treatment of their Claims; provided, however, that the holders of Claims who were deemed to accept the Plan because their Claims were Unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment, modification or supplement, such Claims continue to be Unimpaired.

## X. EFFECT OF CONFIRMATION

### A. Binding Effect

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether any such holders (i) were Impaired or Unimpaired under the Plan, (ii) were deemed to accept or reject the Plan, (iii) failed to vote to accept or reject the Plan, (iv) voted to reject the Plan, or (v) received any distribution under the Plan.

### B. Vesting of Assets

Except as otherwise provided in the Plan, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Debtors or their Estates, including all Claims, rights, defenses, and Causes of Action and any property or assets acquired by the Debtors under or in connection with the Plan, shall vest in each Reorganized Debtor free and clear of all Claims, Causes of Action against the Debtors or their Estates, Liens, encumbrances, charges, and other interests of any and every type, kind, or nature whatsoever.

### C. Discharge of Claims Against and Interests in the Debtors

Upon the Effective Date and in consideration of the Distributions to be made hereunder, to the fullest extent permitted by applicable law, except as expressly provided herein, in the Claims Preservation Agreement, or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest and any Affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, Liens, rights, and liabilities that arose prior to the Effective Date, all of which will be considered waived, released, and discharged as an uncollectible account for tax purposes. Except as otherwise expressly provided herein, upon the Effective Date, all such holders of Claims, Interests, Liens, rights and liabilities and their Affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any Claim, Interest, Lien,

right or liability in or against the Estates, Debtors, or the Reorganized Debtors or any of their assets or property, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases thereof were known or existed prior to or on the Effective Date.

**D. Exculpation**

**EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM, ANY LIABILITY FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO OR ARISING OUT OF THE DEBTORS' CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR EXECUTION OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DISCLOSURE STATEMENT, THE PLAN, THE RESTRUCTURING TRANSACTIONS OR ANY TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; IN ALL RESPECTS THE EXCULPATED PARTIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN THE SOLICITATION OF VOTES AND DISTRIBUTIONS PURSUANT TO THE PLAN IN GOOD FAITH AND IN COMPLIANCE WITH APPLICABLE LAWS AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH ACTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR DISTRIBUTIONS MADE PURSUANT TO THE PLAN.**

**E. Releases**

**1. Releases by the Debtors**

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS, AND IS DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE DEBTORS, THEIR ESTATES, AND THE REORGANIZED DEBTORS, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, FROM ANY AND**

**ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THEIR ESTATES, OR THE REORGANIZED DEBTORS THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP OR OPERATION THEREOF), THEIR CAPITAL STRUCTURE, THE DEBTORS' RESTRUCTURING EFFORTS, THE FILING OF THE CHAPTER 11 CASES, ANY INTERCOMPANY TRANSACTION BETWEEN OR AMONG A DEBTOR AND ANOTHER DEBTOR, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DEFINITIVE DOCUMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DEFINITIVE DOCUMENTS OR THE RESTRUCTURING TRANSACTIONS (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION), THE PURSUIT OF CONSUMMATION OF THE RESTRUCTURING TRANSACTIONS OR ANY OTHER TRANSACTION RELATED THERETO, THE ADMINISTRATION AND IMPLEMENTATION OF THE RESTRUCTURING TRANSACTIONS, ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, AND ANY AND ALL OTHER PAYMENTS MADE, INVESTMENTS UNDERTAKEN, OR VALUE TRANSFERS OF ANY KIND, IN EACH CASE THAT FLOWED FROM THE DEBTOR TO ANY RELEASED PARTY, THE SHAWVILLE LEASE DOCUMENTS CLAIMS, SHAWVILLE TRANSACTION, CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS, THE GENON PARTICIPATION, THE NEW CASTLE HRCO AND THE NEW CASTLE HRCO AMENDMENT, MANAGEMENT SERVICES AGREEMENT, THE O&M AGREEMENT, THE SPONSOR EMA REIMBURSEMENT AGREEMENT, THE TRANSITION SERVICES AGREEMENT AND THE NEW CASTLE CONTRIBUTION AGREEMENT AND ANY TRANSACTIONS RELATED THERETO, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED OR RELATING TO ANY OF THE FOREGOING TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH SOLELY TO THE**

**EXTENT DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION. FOR THE AVOIDANCE OF DOUBT AND WITHOUT LIMITING THE SCOPE OF THE FOREGOING, THE RELEASED CLAIMS SHALL INCLUDE ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER THAT ARISE FROM OR RELATE TO, IN WHOLE OR IN PART, ANY CLAIM TO CHARACTERIZE ANY OF THE SHAWVILLE LEASES AS ANYTHING OTHER THAN A TRUE LEASE OF REAL PROPERTY OR THE SHAWVILLE LEASE DOCUMENTS AND ANY TRANSACTION RELATED THERETO AS ANYTHING OTHER THAN A TRUE SALE TRANSACTION AND A TRUE LEASE TRANSACTION, AND ANY CLAIM BY ANY PARTY TO CHARACTERIZE ANY SHAWVILLE LEASE AS ANYTHING OTHER THAN A TRUE LEASE OF REAL PROPERTY AT ANY TIME INCLUDING IN ANY FUTURE BANKRUPTCY OR ANY OTHER CONTEXT, AND ANY OTHER CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES THAT ARE INCONSISTENT WITH THE STATEMENT BELOW:**

> **THE SHAWVILLE LEASES ARE TRUE LEASES AND THE DEBTORS OR REORGANIZED DEBTORS, AS APPLICABLE, AGREE NOT TO COMMENCE OR CONTINUE ANY CLAIM OR CAUSE OF ACTION, OR OTHERWISE TAKE ANY POSITION IN ANY JUDICIAL PROCEEDING, ADMINISTRATIVE PROCEEDING, OR OTHER PROCEEDING, THE BANKRUPTCY COURT, IN ANY FEDERAL OR STATE COURT, OR IN ANY OTHER COURT, ARBITRATION PROCEEDING, ADMINISTRATIVE AGENCY, OR OTHER FORUM IN THE UNITED STATES OR ELSEWHERE, IN EACH CASE THAT IS IN ANY WAY INCONSISTENT WITH THE POSITION THAT EACH SHAWVILLE LEASE IS A TRUE LEASE.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE EXIT FACILITY, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN. ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTORS' RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTORS' RELEASE IS: (A) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE RELEASED PARTIES' CONTRIBUTIONS TO FACILITATING THE RESTRUCTURING TRANSACTIONS AND IMPLEMENTING THE PLAN; (B) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTORS' RELEASE; (C) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS OR INTERESTS; (D) FAIR,**

**EQUITABLE, AND REASONABLE; (E) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (F) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE DEBTORS' ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTORS' RELEASE.**

**2. Releases by Holders of Claims and Interests**

**EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS PLAN OR THE CONFIRMATION ORDER, IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS, AND IS DEEMED TO BE, HEREBY CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY EACH RELEASING PARTY, THEIR ESTATES, AND THE REORGANIZED DEBTORS IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, MATURED OR UNMATURED, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THEIR ESTATES, OR THE REORGANIZED DEBTORS THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS (INCLUDING THE MANAGEMENT, OWNERSHIP OR OPERATION THEREOF), THEIR CAPITAL STRUCTURE, THE DEBTORS' RESTRUCTURING EFFORTS, THE FILING OF THE CHAPTER 11 CASES, ANY INTERCOMPANY TRANSACTION BETWEEN OR AMONG A DEBTOR AND ANOTHER DEBTOR, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE RESTRUCTURING SUPPORT AGREEMENT, THE DEFINITIVE DOCUMENTS, OR ANY RESTRUCTURING TRANSACTION, CONTRACT, INSTRUMENT RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE DEFINITIVE DOCUMENTS OR THE RESTRUCTURING TRANSACTIONS (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION), THE PURSUIT OF CONSUMMATION OF THE RESTRUCTURING TRANSACTIONS OR ANY OTHER TRANSACTION RELATED THERETO, THE ADMINISTRATION AND IMPLEMENTATION OF THE RESTRUCTURING TRANSACTIONS, ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE ASSERTION OR ENFORCEMENT OF RIGHTS AND REMEDIES AGAINST THE DEBTORS, AND ANY**

Case 23-90032 Document 576 Filed in TXSB on 09/30/23 Page 168 of 225

**AND ALL OTHER PAYMENTS MADE, INVESTMENTS UNDERTAKEN, OR VALUE TRANSFERS OF ANY KIND, IN EACH CASE THAT FLOWED FROM THE DEBTOR TO ANY RELEASED PARTY, THE SHAWVILLE LEASE DOCUMENTS, SHAWVILLE TRANSACTION, CREDIT AGREEMENT AND THE OTHER LOAN DOCUMENTS, THE GENON PARTICIPATION, THE NEW CASTLE HRCO AND THE NEW CASTLE HRCO AMENDMENT, MANAGEMENT SERVICES AGREEMENT, THE O&M AGREEMENT, THE SPONSOR EMA REIMBURSEMENT AGREEMENT, THE TRANSITION SERVICES AGREEMENT AND THE NEW CASTLE CONTRIBUTION AGREEMENT AND ANY TRANSACTIONS RELATED THERETO, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE RELATED OR RELATING TO ANY OF THE FOREGOING TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, EACH SOLELY TO THE EXTENT AS DETERMINED BY A FINAL ORDER OF A COURT OF COMPETENT JURISDICTION, PROVIDED THAT, NOTWITHSTANDING THE FOREGOING OR ANY OTHER PROVISION HEREOF, THE CONSENTING CREDITOR PRESERVED CLAIMS AND THE SPONSOR PRESERVED CLAIMS ARE EXPRESSLY PRESERVED AND NOT RELEASED OR IN ANY WAY AFFECTED OR PREJUDICED HEREBY. FOR THE AVOIDANCE OF DOUBT AND WITHOUT LIMITING THE SCOPE OF THE FOREGOING, THE RELEASED CLAIMS SHALL INCLUDE ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER THAT ARISE FROM OR RELATE TO, IN WHOLE OR IN PART, ANY CLAIM TO CHARACTERIZE ANY OF THE SHAWVILLE LEASES AS ANYTHING OTHER THAN A TRUE LEASE OF REAL PROPERTY OR THE SHAWVILLE LEASE DOCUMENTS AND ANY TRANSACTION RELATED THERETO AS ANYTHING OTHER THAN A TRUE SALE TRANSACTION AND A TRUE LEASE TRANSACTION, AND ANY CLAIM BY ANY PARTY TO CHARACTERIZE ANY SHAWVILLE LEASE AS ANYTHING OTHER THAN A TRUE LEASE OF REAL PROPERTY AT ANY TIME INCLUDING IN ANY FUTURE BANKRUPTCY OR ANY OTHER CONTEXT, AND ANY OTHER CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES THAT ARE INCONSISTENT WITH THE STATEMENT BELOW:**

> **THE SHAWVILLE LEASES ARE TRUE LEASES AND DEBTORS OR REORGANIZED DEBTORS, AS APPLICABLE, AGREE NOT TO COMMENCE OR CONTINUE ANY CLAIM OR CAUSE OF ACTION, OR OTHERWISE TAKE ANY POSITION IN ANY JUDICIAL PROCEEDING, ADMINISTRATIVE PROCEEDING, OR OTHER PROCEEDING, THE BANKRUPTCY COURT, IN ANY FEDERAL OR STATE COURT, OR IN ANY OTHER COURT, ARBITRATION PROCEEDING, ADMINISTRATIVE AGENCY, OR OTHER FORUM IN THE UNITED STATES OR ELSEWHERE, IN EACH CASE THAT IS**

**IN ANY WAY INCONSISTENT WITH THE POSITION THAT EACH SHAWVILLE LEASE IS A TRUE LEASE.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY POST-PLAN EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, INCLUDING THE EXIT FACILITY, OR ANY CLAIM OR OBLIGATION ARISING UNDER THE PLAN. ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD-PARTY RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASES ARE: (A) CONSENSUAL; (B) ESSENTIAL TO THE CONFIRMATION OF THE PLAN; (C) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (D) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASES; (E) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES; (F) FAIR, EQUITABLE, AND REASONABLE; (G) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (H) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASES.**

### F. Injunction

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS OR CAUSES OF ACTION THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION UNDER THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH ANY SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH ANY SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (C) CREATING, PERFECTING, OR ENFORCING AN ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THEIR PROPERTIES ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON**

**ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, NOTWITHSTANDING AN INDICATION IN ANY PROOF OF CLAIM OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE THE RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION.**

### G. Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays arising under or entered during the pendency of the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### H. Ipso Facto and Similar Provisions Ineffective

Any provision of any prepetition policy, contract, or other obligation applicable to a Debtor shall be void and of no further force or effect to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of any of the Chapter 11 Cases, (iii) the Confirmation or consummation of the Plan, or (iv) any Restructuring Transaction.

### I. Compromise and Settlement of Claims and Controversies

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise of all Claims, Causes of Action and controversies relating to the contractual, legal and subordination rights that a holder of an Allowed Claim or Interest may have against any Debtor, or any Distribution to be made on account of such an Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise or settlement and finding that such compromise or settlement is in the best interests of the Debtors and their Estates and is fair, equitable and reasonable.

### J. Protections Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Governmental Units shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because any Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but

before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### K. PJM Settlement

On September 26, 2023, the Debtors filed the Notice of Filing of PJM Settlement Term Sheet [Docket No. 536] (the "PJM Settlement Notice"). Attached to the PJM Settlement Notice as Exhibit A is the PJM Settlement Term Sheet dated as of September 26, 2023, by and among the Debtors (with the consent of the Required Consenting Creditors in accordance with the terms of the Restructuring Support Agreement), PJM Interconnection, L.L.C. and PJM Settlement, Inc. (the "PJM Settlement Term Sheet"). The PJM Settlement Term Sheet is incorporated into the Plan in full by reference. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the settlement in the PJM Settlement Term Sheet and finding that the settlement terms reflected in the PJM Settlement Term Sheet are in the best interests of the Debtors and their Estates and are fair, equitable, and reasonable.

## XI. RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases after the Effective Date to the fullest legally permissible extent, including jurisdiction to:

1. Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, and establish the priority or Secured or Unsecured status of any Claim, including any Administrative Expense Claim;

2. Adjudicate any Retained Cause of Action, including any Avoidance Action;

3. Resolve any disputes relating to the Restructuring Transactions;

4. Grant or deny any applications for allowance of Professional Fee Claims;

5. Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Claims;

6. Ensure that Distributions are accomplished pursuant to the provisions of the Plan;

7. Decide or resolve any motions, adversary proceedings, contested matters and any other matters that may be pending on the Effective Date or brought thereafter in the Chapter 11 Cases;

8. Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Confirmation Order, the Restructuring Support Agreement or the Restructuring Transactions;

9. Resolve any controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is entered into or delivered in connection with the Plan and any Person's or Entity's rights arising from or obligations incurred in connection with the Plan;

10. Modify the Plan pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or remedy any defect or omission or reconcile any inconsistency in any order entered in the Chapter 11 Cases, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, in such manner as may be necessary or appropriate to consummate the Plan and the transactions contemplated hereby;

11. Hear and determine any matter, case, controversy, suit, dispute, or Cause of Action regarding the existence, nature and scope of the releases, injunctions, and exculpation provided in the Plan, issue injunctions consistent with the Plan, and enforce the injunctions contained in the Plan and the Confirmation Order;

12. Enter and implement orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Person or Entity with the consummation, implementation or enforcement of the Plan or the Confirmation Order;

13. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if Distributions are enjoined or stayed;

14. Determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

15. Grant, under section 505(b) of the Bankruptcy Code, an expedited determination with respect to tax returns filed, or to be filed, on behalf of the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date;

16. Enforce, clarify or modify any orders previously entered in the Chapter 11 Cases;

17. Enter final decrees closing the Chapter 11 Cases;

18. Determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes;

19. Assist in recovery of all assets of the Debtors and their Estates, wherever located; and

20. Hear any other matter over which the Bankruptcy Court has jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, the provisions of this Article XI shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

Notwithstanding anything to the contrary contained herein, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement or any other Definitive Documents, in each case, that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court or arbitration, or allows Entities to bring disputes to a different court or demand arbitration, and any disputes concerning documents contained in the Plan Supplement or any other Definitive Document that contain such clauses shall be governed in accordance with the provisions of such documents.

## XII. MISCELLANEOUS PROVISIONS

### A. Dissolution of Creditors' Committee

Except to the extent provided herein, on the Effective Date: (i) the Creditors' Committee, if any, shall be dissolved and shall have no further role in the Chapter 11 Cases except to prepare, file and, if necessary, litigate its final application for compensation and reimbursement of expenses; (ii) the current and former members of the Creditors' Committee, if any, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases; and (iii) the Professionals retained by the Creditors' Committee, if any, will not be entitled to assert any Professional Fee Claims for any services rendered or expenses incurred after the Effective Date in their capacity as Professionals for the Creditors' Committee, except with regard to the services specifically delineated in the preceding clause (i).

### B. Inconsistency

In the event of any inconsistency between the Plan and the Disclosure Statement (including any exhibit or schedule to the Disclosure Statement), the provisions of the Plan shall govern. In the event of any inconsistency between the Plan (excluding any document or agreement filed in the Plan Supplement) and any document or agreement filed in the Plan Supplement, such document or agreement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of any inconsistency between the Plan or any document or agreement filed in the Plan Supplement, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control. Notwithstanding the foregoing, the Debtors remain subject to all of their obligations under the Restructuring Support Agreement to the extent (i) the terms of the Restructuring Support Agreement are not explicitly modified by this Plan or the Confirmation Order and (ii) the Restructuring Support Agreement has not terminated pursuant to its terms.

### C. Exhibits / Schedules

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and constitute a part of the Plan.

### D. Severability

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court or any court of competent jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court may, at the request of the Debtors (subject to the consent rights with respect to the Plan as set forth in the Restructuring Support Agreement), alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such alteration or interpretation, provided that any such alteration or interpretation is consistent with the Restructuring Support Agreement. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### E. Governing Law

The rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require or permit application of the laws of another jurisdiction, except to the extent that (1) the Bankruptcy Code or other federal law supersedes or (2) a document or agreement filed in the Plan Supplement or any Definitive Document provides otherwise (in which case the governing law specified therein shall be applicable to such document or agreement); provided that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in the State of New York shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

### F. Entire Agreement

The Plan, the Plan Supplement, the Confirmation Order, the Restructuring Support Agreement, and the Definitive Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### G. Expedited Tax Determination

The Debtors or Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors for all taxable periods through the Effective Date.

**H. Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**I. Service of Documents**

To be effective, any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors, the Creditors' Committee, if any, the Ad Hoc Committee, the Administrative Agent, GenOn, Financial Sponsor, and the U.S. Trustee must be sent by email or overnight delivery service, courier service, first class mail or messenger to:

**1. Debtors**

**HAYNES AND BOONE, LLP**
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
Email: charles.beckham@haynesboone.com
Email: kelli.norfleet@haynesboone.com
Email: arsalan.muhammad@haynesboone.com
Email: kourtney.lyda@haynesboone.com
Email: david.trausch@haynesboone.com

**2. Ad Hoc Committee**

**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
E-mail: araval@milbank.com
mprice@milbank.com
aharmeyer@milbank.com

**3. GenOn or Financial Sponsor**

**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, NY 10028
Telephone: (212) 450-4000
Email: damian.schaible@davispolk.com
eli.vonnegut@davispolk.com
jacob.weiner@davispolk.com

4. **Administrative Agent**

**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
E-mail: adam.goldberg@lw.com

5. **U.S. Trustee**

515 Rusk Street, Suite 3516
Houston, TX 77002
Attn: Jayson B. Ruff
Telephone: (713) 718-4650
Facsimile: (713) 718-4670
Email: jayson.b.ruff@usdoj.gov

### J. Post-Effective Date Service

After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed renewed requests for service.

## XIII. CONFIRMATION REQUEST

The Debtors respectfully request Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

Dated: September 30, 2023

Respectfully submitted,

HERITAGE POWER, LLC
on behalf of itself and all other Debtors

By: ______________________________
David Freysinger
President
Heritage Power, LLC